WALLING, Adm'r of Wage and Hour Division, U. S. Department of Labor, v.

AMERICAN NEEDLECRAFTS,
Inc.

No. 320.

District Court, W. D. Kentucky, Louisville
Division.

Aug. 7, 1942.

David S. Polier, Atty., U. S. Department of Labor, all of Washington, D. C. (Mortimer B. Wolf, Jacob D. Hyman, Erwin B. Ellmann, and Carroll A. Cahen, all of Washington, D. C., of counsel), for plaintiff.

Allen P. Dodd, of Louisville, Ky., and James R. Layman, of Elizabethtown, Ky., for defendant.

MILLER, District Judge.

This action was filed by Philip B. Fleming, Administrator of the Wage and Hour Division, United States Department of Labor, to enjoin the defendant American Needlecrafts, Incorporated, from violating the provisions of Sections 15(a) (1), 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act of 1938, Title 29 U.S.C.A. § 201 et seq., which deal with minimum wages, maximum hours and keeping of records of employees subject to the provisions of the Act. Jurisdiction of the Act exists in the United States District Court under Section 17 of the Act. U.S.C.A., Title 29, § 217. By successive orders Thos. W. Holland, successor to Philip B. Fleming, Administrator, was substituted for the original plaintiff and thereafter the present plaintiff L. Metcalfe Walling successor to Thos. W. Holland, Administrator, was substituted as the present plaintiff. Following the filing of the defendant's answer and counter-claim intervening petitions were filed by Eleanor Beard, Marvin D. Beard, Sr., Regina, Inc., and by certain individuals doing business as Miller Bros. & Co., which ask to be made parties to the action, and that their intervening petitions be considered as their answer and counter-claim to the petition of the plaintiff. These intervening petitions stated that each of the parties filing them conducted their separate businesses which were in all respects similar to the business engaged in by the defendant American Needlecrafts, Inc., and prayed that their status under the Fair Labor Standards Act with reference to the claims of the plaintiff be adjudicated in this action. The evidence was heard by the Court without a jury.

### Findings of Fact

The defendant American Needlecrafts, Inc., is a New York corporation with its principal office in New York City. It has four branch offices or studios in Kentucky which are located at Elizabethtown, Hardinsburg, Greensburg and Columbia. These branch offices employ approximately forty employees in the studios and deal with approximately 500 workers who perform serv-

Warner W. Gardner, Sol., Roy C. Frank, Asst. Sol., Jeter S. Ray, Regional Atty.,

ices for the studios. These workers, other than the studio employees, are referred to herein as homeworkers for the purpose of description only, in that their exact status and relationship to the defendant is the issue in this case. The company manufactures, sells and distributes in interstate commerce comforters, bed spreads, pillow slips, robes, crib covers, house coats, monogrammed articles and other articles of a kindred nature, which have been produced in part by appliqueing, quilting and needle work on the part of the homeworkers. The articles are produced for and sold in the luxury trade.

The New York office advertises its products and secures the orders which it forwards to the Kentucky studios. The New York office selects the various models and designs which it also supplies to the Kentucky studios. The material used in manufacturing the products according to the model and design chosen is purchased by the New York office and usually sent directly to the Kentucky studios by the manufacturer from whom the defendant has purchased it. The more expensive fabrics are cut and stamped in the New York office before they are sent to the Kentucky studios. When the material is received at the studios in Elizabethtown and Hardinsburg, directly from the manufacturer, each bolt is sent to the stamping room where it is numbered, cut and stamped with the appropriate design. From there it is sent to the equipment room where it is assembled and bundled with bindings, thread, padding and other supplies. From the equipment room the bundle is transmitted to the distributing room from which it is delivered to the homeworker. After the homeworker returns the bundle to the studio the goods are inspected, cleaned and pressed in the studio and shipped directly to the customer. In a few instances some of the articles are shipped to the New York office. The Elizabethtown studio specializes in appliqueing and the Hardinsburg studio in quilting. Chaise sets are quilted in the Columbia studio and finished at Hardinsburg; robes and the tops of comforters are appliqued at Elizabethtown and are stuffed, quilted and finished at Hardinsburg; some comforters are appliqued in Greensburg, bound in Elizabethtown and quilted at Hardinsburg.

The homeworkers are contacted by the defendant through local newspaper advertising, by personal contact through its representatives and by homeworkers interesting new workers in the work. The work which the homeworkers do is skilled, and the ability to satisfactorily perform it exists in practically no communities in the United States other than the counties in Kentucky where the defendant and the intervening petitioners carry on their operations. The homeworkers are the women folks living in the rural districts of that section of Kentucky and consist almost entirely of the wives, widows or daughters of farmers living in that section of the State. These women possess a native ability in expert needle work, in many cases passing from one generation to another. This native ability is in some instances supplemented by instructions on the part of the defendant either at the studio or at the home of the prospective homeworker. But such instruction merely supplements and clarifies by way of detail the basic skill which is already possessed by the homeworker. Homeworkers are required to prove their qualifications for the work applied for before the studio will entrust the work to them. In some instances the prospective homeworker qualifies without instruction from the defendant, while in other instances a certain amount of instruction plus practice is necessary before the worker is considered qualified.

A person who desires to do homework for the studio makes application in the studio for the work desired. If she has proven herself to be a qualified worker, the studio will furnish her with the material and the design. Material which is distributed for quilting and applique work bears a pattern which is stamped on the material. In monogramming the homeworker is furnished a paper model of the letter from which she cuts the letter in cloth and sews it on the material. In case other instructions are considered necessary or advisable by the studio, such as kind or color of thread to be used at certain designated places, they are also given to the worker at the time when the arrangement is entered into. The worker is required to strictly comply with the pattern and specifications which are thus furnished to her by the studio. Substantially all the work involves the reproduction of patterns which have been used by the defendant for a considerable period of time. Occasionally a new design will be received from the New York office with a detailed description of the finished product. Although some of the work is accompanied by detailed instructions as to the manner in which it should be done, such as where the

first stitch is to be taken and how each successive operation thereafter is to be performed, yet such instructions are essentially only suggestions which the homeworker may or may not follow. No supervision or inspection over the work being done by the homeworker is given or exercised by the defendant. The studio looks exclusively to the finished article when returned to the studio by the homeworker in determining whether or not the work has been properly and satisfactorily performed.

When the homeworker applies to the distributing room at the studio for work, the studio delivers to her a bundle containing the material, padding and thread, which also includes the design and any other details concerning the way in which the article is to be completed, as referred to above. At the same time the studio fills out a ticket, which is numbered, by entering on it the name of the homeworker who is receiving the bundle and the date on which it is delivered to her. Sometimes the date on which the work is to be returned in its finished form is also entered on the ticket; at other times the return date is not so entered, although the worker is advised in such instances of when the studio wants it returned. In some instances the amount that the homeworker is to receive for doing the work is also inserted on the ticket; in other instances it is not, although the homeworker in such cases either knows from having previously done similar work or from being told by the studio the amount which she will receive upon it being returned to the studio completed in a satisfactory manner. The bottom part of the ticket carries the same number as the top part of the ticket, and in instances where the amount of compensation and the date of return are inserted on the top part of the ticket they are also entered on the bottom part of the ticket. The bottom part of the ticket is torn off and attached to the bundle that is delivered to the homeworker. The top part of the ticket is retained by the studio and checked against the bundle when it is returned by the homeworker. When a new design is adopted the compensation to be paid for the work is fixed by the studio discussing with the homeworker who worked the new design the amount that the homeworker thinks she should receive, taking into consideration the skill, effort and time involved as compared with other articles which the homeworker has previously done for the studio at an agreed price. Some-

times the homeworker suggests the compensation for the new design which is agreed to by the studio; at other times the homeworker declines to suggest a price and one is then suggested by the studio, to which the worker can agree or not. If the amount asked by the homeworker is considered too high for the studio to meet, it thereafter abandons the model or changes the design so as to require less work. After the price for any particular design has thus been established that price is usually maintained by the studio for other work of the same character and design. There is no obligation on the part of the homeworker to undertake the work at the price thus established and indicated to her when the work is given out, and if she does not care to do that particular kind of work at the designated price she can decline to take that work, or any work, or she can ask for other work which she is willing to do at the established price. No discrimination is practiced by the defendant against a homeworker for not taking a particular kind of work offered to her, or for not taking as much work as the studio wants her to take, or for discontinuing work for the studio entirely for such period of time as the homeworker may not desire to work. The studio attempts to interest as many homeworkers as possible in the community in taking and doing as much work as they are willing to do. The homeworker exercises her own judgment and decision in deciding how much work she will accept from the studio at any particular time, keeping in mind the date on which the studio expects the work to be returned in completed form, and the amount of available time that the homeworker will have for such work during that particular time of the year. In certain seasons of the year when the work on the farm is heavy, such as in canning season, the homeworker has very little time available for such work and will undertake very little, if any, of such work from the studio. At other times when the work on the farm is light and the homeworker has time available from her usual farm duties, she will accept work from the studio to be done by her during such available time. In most instances the homeworker is the wife or daughter of a farmer, lives on the farm, and performs the duties which are usually performed by the women members of a farmer's family, such as cooking the meals, taking care of the house and children, milking, churning, canning, raising chickens and sewing for

the members of the family. The work for the studio in such instances is done at odd times when the farm duties permit, often in periods of only fifteen minutes or half an hour at a time, and at night after the evening meal and housework has been finished. In some comparatively few instances the homeworker is a widow or lives in the community without such farm duties being required of her, in which cases she will do such work for the studio almost constantly throughout the entire day, starting at from 5:30 to 7:00 in the morning and working until 4:00 or 5:00 in the afternoon with only a short period out for lunch. In some instances of this kind the homeworker will work approximately ten hours a day for five or six days a week. It is entirely optional with either type of homeworker how many or how few hours she will work in any particular day, when she will start and when she will stop, and how many days in any week or month she will give to the work. The defendant exercises no control of any kind over how long the homeworker will work in any day or week, at what hour she will start or stop, or at what times during the day, however extended they may be, she will not work at all. The homeworker arranges for and furnishes her own place of work in her own home, usually in the country and frequently ten to twenty miles distant from the studio. She also provides at her own expense the tools which are necessary to perform the work, usually consisting of a frame and clamps, needles and thimbles, and wooden horses. From the time when the bundle is taken from the studio by the homeworker until it is returned to the studio in its completed shape, the defendant has nothing to do with how the homeworkers do the work, when they do it, or the time they put in in doing it.

The homeworker in whose name the bundle is issued by the studio is not required to do the work herself. It is frequently the case that some of the work thus taken out in her name will be turned over to other members of the family or to neighbors who will do the entire work on any one particular piece; frequently such homeworker will do part of the work and let other members of her family do other parts of the work. In some instances one homeworker will make the trip from the country to the studio and receive from the studio in her own name bundles for both herself and neighbors and upon her return to the neighborhood distribute to the neighbors the bundles previously requested by them. The studio keeps no record of who receives these bundles except the record of the one to whom they were delivered, and that person is paid for them when she later collects them from the neighbors and returns them in a satisfactorily completed form to the studio. The neighbor who thus receives a bundle and does the work in it pays to the homeworker bringing it to her and returning it to the studio a percentage (sometimes 10%) of the compensation paid by the studio. The fact that persons other than the one to whom the bundle is issued does all or part of the work is known to the studio and no objection is made thereto. The names of the other persons who perform such work are in most instances not known by the studio. The studio reserves and exercises under its arrangement with the homeworker to whom the bundle is issued the right to inspect the completed article upon its return to the studio and to reject it and decline to pay for the work if in the opinion of the studio it does not satisfactorily comply with the pattern and specifications.

There is no restriction on the part of the defendant against a homeworker working for both it and one or more of its competitors (hereinabove referred to as intervening petitioners) during the same period of time, and in a number of instances a homeworker will have on hand at the same time work received from both the defendant and its competitors.

At times the Kentucky studio would receive a "rush order" from the New York office, being an order in which a customer requests a delivery at a date in the near future, something like three or four weeks or sooner if possible, rather than the usual delivery of some four to six months. Work under such orders is offered immediately to homeworkers for completion in a designated short period of time. Some homeworkers accept such "rush orders" even though they have other work from the studio on hand, which regular work is temporarily laid aside until the "rush order" is completed. In some instances this results in long hours of work per day by the homeworker, sometimes until 2:00 or 3:00 a. m. in order to complete both the "rush order" so accepted and the worker's existing commitments on regular work already on hand. But no worker is required by the studio to accept a "rush order" or is discriminated against or prejudiced in her relations with the studio by reason of her unwillingness or refusal to

accept one. Many workers are willing to and do accept them in order to earn the additional compensation thus offered during that particular period of time.

The work by the homeworker is paid for by the defendant on the piece basis, when it is returned to the studio. The payment of the agreed amount for the particular piece is made to the one in whose name the work was taken out, regardless of who did the work. The defendant is not advised by the homeworker, does not know, and of course keeps no record of how many hours per day or per week are worked by any homeworker, or how many hours of work were given in the completion of any individual piece of work. In most instances, due to the odd and uncertain periods in which the work is done, the homeworker herself keeps no record of the hours of work involved, and has no exact information on this point. It is considered by such workers as a pastime from which some additional income can be obtained to supplement the general income from the farm operations. In the case of a few workers they devote practically all of the day to the work and consider it is regular employment from which they earn their living. In some cases where data has been kept workers have earned an average of 8–15 cents an hour, and in some instances as low as fifty cents a day for a day of eight to ten hours work. The rate of compensation varies by reason of, and depends largely upon, the skill, physical ability and effort expended by the particular worker, and the speed at which she voluntarily regulates her activities. By reason of lack of data the evidence does not show what rate of pay per hour was received by the great majority of the homeworkers, or the number of hours worked per week.

### Conclusions of Law

Section 6 of The Fair Labor Standards Act of 1938 provides that every employer shall pay a designated minimum wage to each of his employees who is engaged in commerce or in the production of goods for commerce.

Section 7 of the Act provides that no employer, except as provided therein, shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than specified hours, unless such employee receives compensation for his employment in excess of the hours specified at a rate not less than one and one-half times the regular rate at which he is employed.

Section 11(c) of the Act requires every employer subject to its provisions to make, keep and preserve certain records of persons employed by him pertaining to wages, hours and other conditions and practices of employment maintained by him.

Section 15(a) (1), 15(a) (2), and 15(a) (5) of the Act make it unlawful for any person to transport in commerce any goods in the production of which any employee was employed in violation of Section 6 or 7 of the Act, or to violate any of the provisions of Section 6, 7 or 11(c) of the Act.

Section 17 of the Act confers upon the United States District Court jurisdiction to restrain violations of Section 15 of the Act, and is the authority for the bringing of this action.

Sections 206, 207, 211(c), 215, 217, Title 29 U.S.C.A.

The defendant contends that the homeworkers are not employees within the provisions of the Act, but are independent contractors who are not included in the Act. The plaintiff contends (1) that the homeworkers are employees and not independent contractors, and (2) even if they should be classed as independent contractors at common law they are nevertheless included within the provisions of the Act. It is conceded by the defendant that the homeworkers are engaged in commerce or in the production of goods for commerce, and that with respect to said homeworkers it has not complied with the provisions of Sections 6, 7 or 11(c) of the Act.

The plaintiff insisted on offering in evidence a great deal of testimony pertaining to the long hours per day given to the work by certain homeworkers, and the small amount of compensation per hour received therefor. This testimony was for the most part merely cumulative and an evident attempt on the part of the plaintiff to stress and base his case on an economic issue which was not properly before the Court in this litigation. The Court recognizes the existence of the conditions which the passage of the Act attempted to eliminate and the benefits which will result from the enforcement of the Act. It does not approve of excessive hours of labor, particularly in the case of elderly women, nor of grossly inadequate pay for tedious, painstaking work, which was shown by the evidence to exist in a few instances. But unless the type of work involved is covered by the statute under consideration, exces-

sive hours and inadequate pay can not be relieved against by the Court. The remedy lies with the legislative branch of the Government. Williams v. United States, 7 Cir., 126 F.2d 129, 133, 134. The sole issue in this case is whether or not the type of work involved is included in the fields of employment which the statute attempts to regulate. If it is not so included, the petition must be dismissed regardless of the claims of the Administrator respecting excessive hours of labor and grossly inadequate pay.

■ The term "employee" in its common law and usually accepted sense includes more than the rendering of services by one person to another, even though such services are for compensation and are performed on the premises of the person who is benefited by such services. Robinson v. Baltimore & Ohio R. Co., 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849; Wells, Fargo & Co. v. Taylor, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205; Chicago, R. I. & P. R. Co. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735; Bowen v. Gradison Construction Co., 236 Ky. 270, 32 S.W.2d 1014; Barnes et al. v. Indian Refining Co. et al., 280 Ky. 811, 134 S.W.2d 620.

■■ Ordinarily, where one employs another to execute a piece of work, and the one so employed has the right to select his own assistants and help, the employer having no control over the hands of the employee and no right to direct the manner in which the work shall be done other than to require that it shall be done in accordance with the specifications under which it is contracted to be done, the one so contracted with is an independent contractor and not an employee. The absence of the power on the part of the employer to terminate the employment at any time is a decisive element in making the relationship that of an independent contractor instead of an employee. Kentucky Cottage Industries v. Glenn, D.C., 39 F.Supp. 642; Williams v. United States, 7 Cir., 126 F.2d 129; Lexington & E. R. Co. v. White, 182 Ky. 267, 206 S.W. 467; American Savings Life Ins. Co. v. Riplinger, 249 Ky. 8, 60 S.W.2d 115; Harmount & Woolf Tie Co. v. Baker, 251 Ky. 795, 66 S.W.2d 45.

■ Congress in providing by the Act in question that the term "employ" includes "to suffer or permit to work", 29 U.S.C.A. § 203(g), did not intend to destroy the long established rules fixing the status and affecting the relationship of employer and employee in actions based upon that relationship. The phrase was used for the purpose of protecting employees who actually were employees within the usually accepted meaning of the terms regardless of terminology used in the contract of employment. Maddox v. Jones, D.C., 42 F.Supp. 35; David v. Boylan's Private Police, D.C., 34 F.Supp. 555.

■ The Fair Labor Standards Act of 1938 applies only to the relationship of employer and employee. One who performs services for another under the arrangement recognized at common law as that of independent contractor is not an employee within the provisions of the Act. Bowman v. Pace Co., 5 Cir., 119 F.2d 858; Whatley v. Great Southern Trucking Co., 5 Cir., 123 F.2d 143; Fleming, Adm'r, v. Gregory, D. C., 36 F.Supp. 776; Thompson v. Daugherty, D.C., 40 F.Supp. 279. See also National Labor Relations Board v. Carroll, 1 Cir., 120 F.2d 457; Buckstaff Bath House Co. v. McKinley, 308 U.S. 358, 362, 363, 60 S.Ct. 279, 84 L.Ed. 322.

There is no dispute between the parties concerning the status of the studio workers. It is conceded by the defendant that they are employees and included within the provisions of the Act. Accordingly, the Court finds that the studio workers are employees of the defendant and subject to the provisions of the Fair Labor Standards Act of 1938.

■ The homeworkers performed their services for the defendant under a contract which called for a completed job according to specification without supervision over the work while it was being performed, which permitted others selected at the will of the homeworker to do all or any part of the necessary work, and which did not permit the defendant to withdraw the work from the homeworker or to discharge her before the job was completed. Each job was a separate entity, and the right remained with both the homeworker and the defendant to either discontinue such work at the completion of any job or to contract for another one at a price satisfactory to both parties. The time limit imposed by the defendant for the completion of the job was but a term of the contract which the home worker had the option to accept or reject. The right to reject the completed job for failure to comply with the specifications or for lack of the necessary skill, warranted by

the homeworker to exist on her part, is a right which is inherent in any contract with an independent contractor. The practical result of continuity of employment and incidents pertaining thereto, resulting from the voluntary renewals of successive contracts can not destroy the legal contractual obligation existing in each contract. A valid contract voluntarily and bona fidely entered into must be recognized by the Court, even though its purpose is admittedly to avoid the effect of the provisions of the Fair Labor Standards Act. Walling, Adm'r, v. A. H. Belo Corporation, June 8, 1942, 62 S.Ct. 1223, 86 L.Ed. ——.

The Court holds that the homeworkers are independent contractors rather than employees of the defendant and are not subject to the provisions of the Fair Labor Standards Acts of 1938. Kentucky Cottage Industries v. Glenn, D.C., 39 F.Supp. 642; Bowman v. Pace Co., 5 Cir., 119 F.2d 858; Whatley v. Great Southern Trucking Co., 5 Cir., 123 F.2d 143; Fleming, Adm'r, v. Gregory, D.C., 36 F.Supp. 776; Thompson v. Daugherty, D.C., 40 F.Supp. 279; In re Ten Eyck Co., D.C., 41 F.Supp. 375.

Counsel will tender judgment for entry in accordance with above rulings.