No. 35,816

O. E. JACKSON, *Appellant*, v. THE DERBY OIL COMPANY, *Appellee*.

(139 P. 2d 146)

Opinion filed June 12, 1943.

J. N. *Tincher*, of Hutchinson, argued the cause, and *Clyde Raleigh, J. N. Tincher, Jr.*, both of Hutchinson, and *Leaford F. Cushenbery*, of Medicine Lodge, were on the briefs for the appellant.

*Verne M. Laing*, of Wichita, argued the cause, and *Charles G. Yankey, Harvey C. Osborne, John G. Sears, Jr.*, all of Wichita, and *Warren H. White*, of Hutchinson, were on the briefs for the appellee.

The opinion of the court was delivered by

Harvey, J.: This was an action for overtime, liquidated damages, and attorneys' fees brought under the Fair Labor Standards Act, 29 U. S. C. A., § 201 *et seq.* The trial court sustained a demurrer to plaintiff's evidence and he has appealed.

In his petition, filed June 11, 1941, plaintiff alleged that defendant is a producer, refiner and marketer of petroleum and its products and is engaged in interstate commerce; that about October 25, 1938, defendant notified its employees that it was under and intended to comply with the Fair Labor Standards Act; that plaintiff was engaged in working for defendant, and the number of hours he worked for defendant each week, beginning August 6, 1939, to October, 1940, was alleged; the lowest number of hours worked each week was alleged to be 44 and the highest 81. He alleged that under his contract of employment he should have worked but 44 hours per week prior to October 28, 1939, and but 42 hours per week since that date, and that he was entitled to recover $1.22 per hour for his overtime hours prior to October 28, 1939, and $1.275 per hour for his overtime since that date, and in addition thereto that he is entitled to recover an equal sum as liquidated damages, making a total of $2,734.05. He alleged that he was not versed in the law; that he had kept his time carefully since the law went into effect; that he offered to turn in his correct time several times to his employers, but they insisted that he give them, for their temporary purposes and use, the time provided by law, and that other and additional overtime would be cared for in a different manner. He further alleged that he kept the correct hours worked by him and submitted the same to defendant, but that defendant refused to pay him for his overtime or any liquidated damages.

Defendant in its amended answer denied all allegations of the petition not expressly admitted, admitted the residence of plaintiff, the corporate existence of defendant and that it is engaged in the producing, refining and marketing of petroleum products. It further admitted that plaintiff is now and has been employed by defendant, and alleged that prior to October 24, 1938, he was employed as district foreman of the Haven district; that on and after October 24, 1938, it has been the policy and intention of defendant to comply in all respects with the Fair Labor Standards Act of 1938, and to all employees covered by the act, which fact, policy and intention were well known to plaintiff in his capacity as district fore-

man; that plaintiff had several employees, including lease pumpers, roustabouts and extra employees, directly responsible to him from October 24, 1938, up to about August 7, 1939, and during said period plaintiff, as district foreman of said employer, advised with them with respect to compliance by the employees with the wage and hour act; that from and since August 7, 1939, plaintiff was employed by defendant as lease pumper on the Ackley oil and gas lease, and as such lease pumper knew at all times of the policy and intention of defendant to comply in all respects with the wage and hour act as to all employees covered by the act; that from and since August 7, 1939, to October 24, 1940, plaintiff, at regular intervals, turned in time sheets signed by him setting forth the number of hours he had worked each of the periods covered by the time sheets; that defendant has paid plaintiff for all straight time and all overtime, as shown by such time sheets; that plaintiff never contended to defendant specifically denied that plaintiff offered at any time to turn payment for overtime except as shown by the time sheets. Defendant specifically denied that plaintiff offered at any time to turn in other or different time records than the time sheets above mentioned, and further specifically denied that any officer, agent or, employee of defendant had authority to change, vary or waive the rules and policy of the defendant to comply with the wage and hour act, all of which was well known to plaintiff. Defendant specifically denied that plaintiff had worked overtime and alleged that plaintiff has been fully paid for all time worked, and in the alternative it is alleged that if plaintiff has worked overtime he has been fully paid for all straight time and all overtime, if any, worked. Defendant also pleaded the one-year statute of limitations (G. S. 1935, 60-306, *fourth*).

The reply was a general denial.

Evidence on behalf of plaintiff may be summarized or quoted as follows: Plaintiff began working for defendant in July, 1930, as clutch man at Valley Center. In July, 1934, he became district foreman of the Haven district, which included a number of oil and gas leases. One of these was the Ackley lease, a described 80-acre tract on which there were four wells, one or more producing gas and the others oil, and all being pumped. As district foreman plaintiff visited each of the leases in his district every day, conferred with the pumpers, roustabouts or other employees of defendant working on the leases, and if the pumper needed extra help plaintiff saw that he got it. He delivered to the men working on the leases in

his district instructions of defendant with regard to their employment and work, took up their time sheets and delivered them with their checks, and made reports to his superiors. His immediate superior in defendant's organization was C. H. Mercer, whose title was superintendent. Above him was D. S. Cates, manager of production division, and above him were the executive officers, including H. E. Zoller, executive vice-president. The general offices of defendant were at Wichita.

Plaintiff was district foreman when the Fair Labor Standards Act of 1938 went into effect. In preparation for that defendant held meetings with its employees. Plaintiff attended some of those meetings. Defendant adopted a policy of conducting its business in conformity with the act respecting hours, wages and overtime of its employees who come within the provisions of the act and advised each of its employees with respect thereto. At that time Francis Beard was employed as pumper of the Ackley lease. The communication to him reads:

"Exhibit 1.

"The Derby Oil Company

Producers, Refiners, Marketers,
Petroleum and Its Products

Wichita, Kansas

October 25, 1938

"Mr. Francis Beard:

"In order that you clearly understand the policy of your company in regard to the Fair Labor Standards Act of 1938, we outline for you in this letter, that Policy.

"1—The Derby Oil Company shall comply with the Act in every respect.

"2—In *no event* shall any employee, covered by the Act, work more than 44 hours in any one week during the first year of the Act.

"3—In all cases, where it is possible, employees covered by the Act shall work five eight hour days and four hours on Saturdays.

"4—In emergency cases where work cannot be adequately handled by regular employees within the forty-four hour schedule, then extra or pick-up labor shall be employed.

"5—All employees are covered by the Act except those employed in executive, professional or supervisory capacity, namely, Departmental Executives, District Foremen, Head Roustabouts, Land Men, Geologists and Tool Pushers.

"Very truly yours,        D. S. Cates,

*Manager Production Division.*"

"C. H. Mercer

C/mg

Plaintiff was familiar with the policy of the company in this regard. He delivered the above statement to Francis Beard on Oc-

tober 25, 1938, at the same time he delivered him his check. He also delivered to each of the other pumpers and employees working on the leases in his district a similar statement. Beard continued to act as pumper on the lease until 1939, when he was succeeded by Charles Litterell, who was the pumper on the lease until August 6, 1939.

At the suggestion of Mercer plaintiff prepared a schedule of hours of work for each of the pumpers on the several leases within his district. So far as pertinent here this reads:

"To Mr. C. H. Mercer.

"Below is a schedule for the pumpers in the Haven district for the new law that goes into effect soon, subject to your approval.

"Ackley· Lease, F. L. Beard, Pumper 6:30 to 9 a. m.—2 to 3 p. m.—5 to 7 p. m.—8:30 to 9 p. m.—6 hours. 7 six-hour days. . . .

"Yours truly, O. E. JACKSON."

This also was delivered to Beard.

About the last of July, 1939, Mercer asked plaintiff to take the job of pumper on the lease instead of being district foreman. Perhaps this was caused by a change in the set-up of the production department of defendant. As district foreman plaintiff's salary had been $190 per month; as pumper of the Ackley lease his salary was $155 per month. Plaintiff moved into a residence property owned by defendant on the Ackley lease on August 5 and began work as pumper the next day. When he took over the work as pumper on the Ackley lease he found in the desk in the lease house the statement of the policy of the company which he had delivered to Francis Beard October 25, 1938.

Shortly before the Fair Labor Standards Act of 1938 had been in effect one year, at which time the work week would be reduced by the act to 42 hours per week, in evidence of its policy with respect thereto defendant issued and delivered to each of its employees, including plaintiff, the following:

"THE DERBY OIL COMPANY

Producers, Refiners, Marketers,
Petroleum and Its Products

Wichita, Kansas

"To: Employees Production Division The Derby Oil Company.

"Prior to October 24, 1938, you were advised that our Company was adopting a policy whereby the maximum hours work week was limited to 44 hours. You were also advised that overtime work would not be permitted.

"A re-statement of policy with respect to the work week hours appears to be in order.

"A maximum 44 hour work week has been in effect the past year and to a commendable degree actual working hours have been held to a lesser number of hours. The management feels that the time has arrived when an average work week should not exceed 40 hours with an absolute maximum of a 42 hour work week in the event of emergencies. No overtime is permitted.

"Therefore, beginning the week of October 21, 1939, work must be held currently to an absolute minimum consistent with the proper conduct of our Company's business. This can be accomplished by advance planning of work and the performance of duties under such plans.

"The management expects all employees to cooperate fully in carrying out the policy adopted through strict adherence to the instructions herein outlined.
"THE DERBY OIL COMPANY."

Plaintiff testified that he had a talk with Cates about the 19th or 20th of August, 1939. "Cates told me to go ahead and hire helpers, and he said, 'You are lease operators instead of pumpers. Go ahead and pump them.'" That about three days later Arch Peters came out "and I said, 'Do you want me to hire help like Mr. Cates said?' and he said, 'No; if anything goes wrong, call me.'" Plaintiff further testified that one time the last part of August, up by the tool house on the lease, "I told Arch Peters that the lease couldn't be operated in 44 hours. . . . He said he knew it, but we had to go ahead and work and keep our damned mouths shut."

Plaintiff testified that after he had been working there perhaps two months Mercer came one day and asked him if he would take a foreman's job; said that L. E. Douglass wanted a foreman over on the Theede lease, and that during the conversation he told Mercer the lease could not be operated in 44 hours. What reply, if any, Mercer made is not disclosed.

Plaintiff testified that after Eckel took over the work Peters had been doing he hired George Pyle as extra worker. "Mr. Eckel told me, after he had already hired Mr. Pyle extra, he told me if I needed help and I had to have it, to get hold of George Pyle. . . . After Mr. Eckel was head roustabout I asked him if he wanted me to hire help like Cates said, and he said, 'No,' if anything went wrong, to call him."

Plaintiff testified: "I knew I was supposed to be working 44 hours a week."

Defendant furnished a telephone in the lease house on the Ackley lease where plaintiff could call the Haven headquarters on business. He testified he was supposed to call only in an emergency and to reverse the call. "I did call if I thought it was an emergency."

Plaintiff testified that on February 12, 1940, he talked with Mr.

Zoller at the main office in Wichita and told him: "The Ackley can't be operated in 44 hours a week. I've got 335 hours in January." He said: "I don't want you boys to work that way, and you should have a day a week off." Beginning in April, 1940, plaintiff was given Tuesday of each week off. He further testified that sometime in April or May, 1940, he had a talk with Cates in which he told him the lease could not be operated in 44 hours and that Cates replied: "Well, . . . we started giving you a day off a week in April, 1940." Plaintiff testified that while he was district foreman Jess Rogers, who was one of the employees of defendant working under him, turned in time sheets showing more than 44 hours work; that at the direction of Mercer he returned it to Rogers and had him change it to show that he had worked only 44 hours. Rogers, called as a witness, testified that he had turned in the time sheet showing extra time and that plaintiff returned it to him.

Plaintiff testified that in looking after the pumping he made a round of the pumps early in the morning. "If there is nothing wrong, it will take two hours, reading the meters and checking the engines and bearings and making out my reports. If there is something wrong, it will take longer." Usually he checked them four times a day, but oftener if a bearing was running hot or there was some other trouble. It did not take so long to make the other rounds. It took about an hour to check and oil the pumps. They were oiled twice a day. The last checking was late in the evening, about nine o'clock. That he did a lot of extra work—roustabout work, such as "goosing" the grass about the wells and pumps; this was done with a push shovel; mowing grass, repairing salt-water hose, fixing belts, and other work about the lease. Charles Litterell had worked as pumper on the lease for four months just before plaintiff took it over and he testified that looking after the pumps on the lease would take four or five hours a day if a person did nothing else; that although he had a roustabout to help him a part of the time he put in from 48 to 51 hours per week. A part or all of this time he was also pumper on two other leases. George M. Pyle testified that he was hired by Eckel as a roustabout and worked on the Ackley lease whenever the plaintiff called him; also that his father did some roustabout work on the lease.

Defendant's practice was to pay its employees semimonthly, as authorized by our statute (G. S. 1935, 44-301). Throughout the time covered by this action, August 6, 1939, to October 26, 1940, plaintiff made out his time sheets semimonthly and received his pay

at the rate of $155 per month. These time sheets have a place for noting the number of hours worked each day. None of them showed plaintiff to have worked more than 44 hours in any week prior to October 28, 1939, nor more than 42 hours in any week after that date; a few of them showed fewer hours worked. Each of these time sheets was signed by plaintiff.

Plaintiff testified that when he began work as a pumper on the Ackley lease he kept a daily record of the hours he worked in books which at some time had been furnished him by defendant; that he continued to keep such a record daily up until the latter part of October, 1940. These books were introduced in evidence. They showed the number of hours worked by plaintiff as alleged in his petition. He had kept these books secretly and had never shown them to any of the officers, or his superior employees, of defendant. No officer or other employee of defendant was in position to check the number of hours worked each day or week by plaintiff. The accuracy of the entries in these books depends solely upon the testimony of plaintiff.

There is no evidence that plaintiff at any time covered by the claim here presented from August 6, 1939, to October 26, 1940, presented any claim to defendant for pay for overtime work. He testified:

"After I turned in this overtime, Mr. Eckel said, 'We will not make you roustabout now.' He said, 'I will furnish roustabouts, and you do the pumping so you don't get any overtime.' "

The date of this conversation is not shown, but obviously it was sometime later than October 26, 1940.

There is no evidence that the work interfered with plaintiff's rest at night, or with time for his meals, and he testified that normally he had time each day to go to town, to play golf, which he did only a few times, or to use otherwise as he pleased.

We turn now to the questions involved in the court's ruling sustaining defendant's demurrer to plaintiff's evidence. In doing so we keep in mind the well-settled rule that in ruling on such a demurrer the trial court cannot weigh the evidence nor pass upon the credibility of witnesses, but must construe the evidence as favorably to plaintiff as it is reasonably possible.

We first note there is no evidence in the record to sustain the allegation of the petition that plaintiff "offered to turn in his correct time on several different occasions to his employer, but they insisted

that he give them for their temporary purposes and use the time provided by law, and that the other or additional overtime would be cared for in a different manner."

With respect to his hours of work and overtime, plaintiff's contract with the defendant was evidenced by the letter of October 25, 1938, in which defendant stated its policy with reference to the Fair Labor Standards Act. In that it was said:

"In *no event* shall any employee, . . . work more than 44 hours in any one week. . . . where work cannot be adequately handled by regular employees within the forty-four hour schedule, then extra or pick-up labor shall be employed."

In short, it was a specific element of his employment that he should not work overtime. Plaintiff knew that he was to work only 44 hours a week, and so testified. He outlined a schedule of the time for a pumper to pump the wells on the Ackley lease, which allowed a six-hour work day. His testimony disclosed that unless there was some emergency the work of looking after the pumps could be done in not to exceed five hours, and Litterell, who had looked after the pumps on the Ackley lease shortly before plaintiff took over that work, testified that the time required to look after the pumps was from four to five hours per day. So, the evidence clearly establishes that 44 hours a week, even 42 hours, allowed ample time for the normal work of looking after the pumps and gave as much as an hour to care for minor difficulties which arose in the operation of the pumps. Plaintiff knew this when he talked to Cates about two weeks after he commenced work on the Ackley lease, at which time Cates stressed the thought that he wanted the oil pumped, and told him to hire extra help if necessary. When he talked to Peters, about three days later, Peters told him that if he wanted extra help to call him. The company furnished plaintiff the telephone, which he was at liberty to use for that purpose. There is a suggestion here that this is a change from Cates' direction. The only difference, if anything, was whether plaintiff should hire the help without saying anything to anyone about doing so or should first call Peters. We think it unreasonable to construe this as any authorization for plaintiff to work longer than 44 hours per week. It was information necessary for defendant's records. Neither was it any indication that extra help would not be furnished. Peters appears to have stressed the thought also that attention should be given to doing the work rather than talking about it. But even that carries no reasonable implication that it was to be done in violation of his contract of

employment. When Eckel came on the job he hired an extra roustabout, whom plaintiff was free to call when he needed him. When the Fair Labor Standards Act had been in effect a year defendant distributed to its employees an additional statement of its policy supplemental to the one issued earlier. In that the employees were reminded that from the start its policy was "overtime work would not be permitted." It recited:

"The management feels that the time has arrived when an average work week should not exceed 40 hours with an absolute maximum of a 42 hour work week in the event of emergencies. No overtime is permitted."

There is nothing in plaintiff's testimony of his talk with Zoller in February, 1940, or with Cates later in April or May, which tends to establish the allegations that defendant asked its men to return only the hours worked, as authorized by law, and that defendant would pay for overtime on some other basis. Eckel's statement to plaintiff, when he finally turned in his claim for overtime, was a restatement of what plaintiff had been told repeatedly and consistently from the time the Fair Labor Standards Act went into effect.

The statute (29 U. S. C. A. § 203), containing definitions, includes:

"(e) 'Employee' includes any individual employed by an employer. . . . (g) 'Employ' includes to suffer or permit to work."

Appellant argues that defendant suffered or permitted plaintiff to work overtime. We think the words "suffer" and "permit" as used in the statute mean "with the knowledge of the employer."

See 60 C. J. 991; *Gregory v. U. S.*, 10 F. Cas. No. 5,803; *Wilson v. The State*, 19 Ind. App. 389, 46 N. E. 1050; *Allison v. Commonwealth*, 221 Ky. 205, 298 S. W. 680; *Clover Creamery Co. v. Kanode*, 142 Va. 542, 129 S. E. 222. See, also, 48 C. J. 924, and authorities there cited.

In *Walling v. American Needlecrafts*, 46 F. Supp. 16, it was held:

"In providing by the Fair Labor Standards Act that the term 'employ' includes 'to suffer or permit to work,' Congress did not intend to destroy established rules fixing the status and affecting the relationship of employer and employee in actions based upon that relationship, and the quoted phrase was used to protect employees who actually were employees within the usually accepted meaning of the terms, regardless of terminology used in contract of employment." (Syl. ¶ 6.)

We think there is no evidence in this record to sustain the view that defendant knew plaintiff was working overtime and thereby suffered or permitted him to do so. Having employed him to work, they knew he was working. They knew also the wells could be

pumped without overtime work. Plaintiff himself had prepared a schedule for the pumping of the wells which clearly disclosed that fact, and his testimony at the trial and that of the only other witness he called on that point was to that effect. Defendant very emphatically told him when he was employed not to work overtime. He knew that and understood it. We think defendant acted within its rights in establishing a rule or policy of prohibiting overtime work. (See *Fleming v. Stillman*, 48 F. Supp. 609.) So long as the compensation is as great as that fixed by the act the employer is free to work out the compensation problem in his own way. (*Williams v. Terminal Co.*, 315 U. S. 386, 62 S. Ct. 659.)

The administrator of the Fair Labor Standards Act has given much consideration to the wage and hour provisions of the act as they apply to pumpers of oil wells, caretakers, custodians, watchmen, or other employees whose hours of work are not supervised by the employer. (See the Wage and Hour Manual, 1942 edition, paragraphs 7 and 8 of Interpretative Bulletin No. 13, pp. 124, 125, Official Answers to Questions, pp. 165 and 320, and Explanation of Regulations, pp. 292, 293.) These interpretations are persuasive. (*Overnight Motor Co. v. Missel*, 316 U. S. 572, 62 S. Ct. 1216.) Without quoting these at length it is clear that the Administrator attempted to make and interpret regulations that would be workable and at the same time be fair both to the employers and to employees. In this type of work it is clear that the employee is the only one who knows how many hours he works, and the employer is justified in relying on his time sheet unless he knows it to be inaccurate. Semimonthly payments may be computed on the work-week basis. The employer is required by the act to keep a correct record of the hours worked by his employees, the wages paid, and other details. He is liable for severe penalties if he does not do so. The act, of course, was intended to be a *Fair* Labor Standards Act. The administrator appears to be using every reasonable effort to have it operate fairly. It is not consistent with that viewpoint that an employee, forbidden by his contract of employment to work overtime, should conceal from his employer the fact that he is working overtime, if he is really doing so. Courts do not look with favor upon a claim of that kind by an employee.

(*West v. Cleveland Overall Company*, 4 W. H. R. 502; *Cordell v. H. F. Wilcox Oil & Gas Company*, 4 W. H. R. 606; *Walling v. Woodruff*, 5 W. H. R. 727, 729 [49 F. Supp. 52]; *Mortenson v. Western*

*Light & Telephone Co.,* 42 F. Supp. 319; *Dollar v. Caddo River Lumber Co.,* 43 F. Supp. 822; *Epps v. Weathers,* 49 F. Supp. 2; *Feldman v. Roschelle Bros.,* 49 F. Supp. 247.)

Judgment in such cases cannot rest upon guess, speculation or suspicion. The burden of proof rests upon plaintiff. In this case we think it clear that he failed to establish by evidence the material allegations of his petition.

At the beginning of the trial defendant made a written offer to confess judgment under our statute (G. S. 1935, 60-2941) for a stated sum. Appellant presents no question to this court relating to that matter, hence we need not consider it.

The judgment of the trial court is affirmed.