**FOX et al. v. SUMMIT KING MINES, LIMITED.**

No. 10526.

Circuit Court of Appeals, Ninth Circuit.

June 27, 1944.

Martin J. Scanlan, of Reno, Nev., for appellants.

Thatcher & Woodburn, George B. Thatcher, Wm. Woodburn, and Wm. J. Forman, all of Reno, Nev., for appellee.

Douglas B. Maggs, Sol., Wage and Hour Division, U. S. Dept. of Labor, Bessie Margolin, Asst. Sol., Morton Liftin and Frederick U. Reel, all of Washington, D.

C., and Dorothy Williams, of San Francisco, Cal., for Administrator of Wage and Hour Division, U. S. Dept. of Labor, amici curiæ.

Before WILBUR, GARRECHT, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

This action was instituted by eleven former employees of the Summit King Mines, Limited, a Nevada corporation (appellee herein), to recover unpaid overtime compensation allegedly due them under the provisions of the Fair Labor Standards Act of 1938, Title 29 U.S.C.A. §§ 201–219, 52 Stat. 1060 (hereinafter referred to as the Act), together with liquidated damages, attorneys fees and costs as provided in the Act.

Appellee denies that there is any unpaid compensation due the appellants and also denies that it was engaged in commerce within the provisions of the Act.

By stipulation entered into between the parties on October 20, 1942, in order to reduce the issues involved in the case, it was agreed that the appellee "produced gold and silver ores in Churchill County, Nevada, and that the same were reduced to bullion and transported by United States Mail in interstate commerce from Churchill County, Nevada, to San Francisco, California, and that the bullion was sold to the United States Mint at San Francisco, California."

The parties further stipulated that the computations submitted by appellants and the total amount of compensation claimed to have been earned and unpaid in the Amended Bill of Complaint are correct in accordance with plaintiffs' theory of the case and need not be proven, and also that the testimony of the plaintiffs not present at the trial would be the same as the plaintiffs testifying, as to the same character of work, mill routine, policy of management, making time and work reports and other evidence of a general nature pertaining to their employment.

The mill began operations on January 5, 1940, when the 42-hour week was in effect under the said Fair Labor Standards Act and since has been in operation continuously including all the time here in question. All of the appellants were employed in appellee's mill subsequent to the enactment of the Act for various periods of time between January, 1940 and April, 1942.

The mill was operated continuously for twenty-four hours per day. Each work day was divided into three shifts of eight hours each. Two men were employed on each shift, one in charge of the ball mill and the other of the solution process, the latter being in supervisory charge of the shift.

Prior to the opening of the mill, and again on April 23, 1941, the management had posted in the mill notices to mill employees fixing the rates and lunch period.

Appellants allege that prior to April 23, 1941 they rendered services to the appellee for eight hours during every shift of their employment and were responsible to the appellee for the proper and careful operation of the machinery and equipment and for the flow, thickening, separation, sampling, and other processes of the ore through the mill for each eight-hour shift, but received compensation therefor for only seven hours; that after that date, on April 23, 1941, to settle a controversy which arose between the appellants and the management relative to an increase in wages, the management agreed that the mill men would get an increase of 25 cents per shift computed at the rate of time and one-half for eleven minutes per shift for the solution men, and time and one-half for twelve minutes per shift for the ball-mill men, which resulted in an increase of approximately $1.50 per week. The appellants claim that they were not paid for 49 minutes and 48 minutes, respectively, for the solution men and the ball-mill men.

Appellee concedes that the mill operated continuously for twenty-four hours per day, divided into three shifts of eight hours each, but contends that the mill men were allowed one hour for lunch each shift and therefore were entitled to compensation for only seven hours each shift until April 23, 1941, at which time the management agreed to pay the solution men and the ball-mill men overtime for eleven and twelve minutes of the alleged "lunch hour," respectively.

The case was tried in the District Court, without a jury, on January 27, 1943, and that court rendered judgment against appellants and they have appealed.

The District Court made the following findings of fact:

"That beginning in the month of January, 1940 and ending on the 1st day of April, 1942 defendant had employed plain-

tiffs in this action for various periods of time in a mill for the reduction of gold and silver ores operated by defendant.

"That none of the plaintiffs during his period of employment by defendant was engaged in commerce or in the production of goods for commerce.

"That the said mill of the defendant operated for a period of twenty four hours per day, divided into three shifts of eight hours each; that each of the plaintiffs performed work, labor and services in said mill for a period of seven hours during the particular shift upon which he was working, and that each of the plaintiffs was free from duty for a period of one hour during each shift for the purpose of eating his lunch; that each of said plaintiffs was paid in full by defendant at the rate of wages established by agreement between plaintiff and defendant, which wage was in excess of that required by the Fair Labor Standards Act; that each of said plaintiffs was paid overtime at the rate of one and one-half times the amount of the agreed wage for all hours worked in excess of forty two hours a week during the period of employment from January, 1940 to October, 1940; that from October, 1940 to the termination of the employment of each of the plaintiffs each of said plaintiffs was paid overtime at the rate of one and one-half times the agreed wage for all hours worked in excess of forty hours per week.

"That none of the said plaintiffs made any claim for overtime other than that they paid defendant during the period of his employment by defendant and that none of said plaintiffs made any claim for the payment of overtime until the making of demand upon defendant prior to the filing of the action in the present case, said demand being refused by defendant.

"That none of the plaintiffs performed any work or labor for defendant during the lunch hour or at any other time for which he did not receive pay for overtime at one and one half times the agreed wage."

The paramount issue in this case is whether the Summit King Mines, Limited, is engaged in the production of goods for commerce within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219, 52 Stat. 1060. In decid-

ing this issue, the District Court relied on the case of Holland v. Haile Gold Mines, Inc., 44 F.Supp. 641. That case was subsequently reversed by the Circuit Court of Appeals for the Fourth Circuit (Walling v. Haile Gold Mines, 136 F.2d 102, 103), which held:

" 'Production' as defined in Section 3(j) of the Act [29 U.S.C.A. § 203(j)] expressly includes mining as well as 'any process or occupation necessary' to production. 'Goods', as that term is used in Section 3(i) of the Act, means 'articles or subjects of commerce of any character.' This definition of goods is broad enough to include gold, since Section 3 of the Gold Reserve Act, 31 U.S.C.A. § 442, specifically provides that gold may, under certain circumstances, be used 'for industrial, professional, and artistic' purposes. [Citing case] Section 3(b) of the Act defines 'commerce' as including 'transportation, transmission, or communication among the several States or from any State to a place outside thereof'. It cannot be denied that the gold produced by Haile was transported and transmitted from South Carolina to a 'place outside thereof'."

In the case at bar, as in the Haile Gold Mines case, supra, the gold and silver bullion, after it is obtained from the mine, is delivered by appellee to the United States Post Office in its county in Nevada, and from there forwarded to the United States Mint at San Francisco, California.

While the Supreme Court has not ruled on this question, the determination of the Fourth Circuit is in accord and consistent with decisions of this Court and other courts under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.[1]

Appellee cites the case of National Labor Relations Board of Idaho-Maryland Mining Corporation, 9 Cir., 98 F.2d 129, in which a contrary conclusion was reached by this court. That case has no bearing upon the case at bar because the facts in the former case were different. The Idaho Maryland Mine was located in California; the product was produced in California and was sold to a government mint located in California. Thus, the product produced by the mine did not cross state lines at any time before it reached the mint when it

---

[1] National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, certiorari denied 312 U.S. 678, 61 S.Ct. 447, 85 L.Ed. 1118; Canyon Corp. v. National Labor Relations Board, 8 Cir., 128 F.2d 953.

became the property of the United States Government. We did hold in the above case that the subsequent shipment of the gold and silver by the mint to Denver for safe-keeping was an administrative act of the Government and not such a commercial transaction as would render the respondents' activities subject to the National Labor Relations Act, but those shipments across State lines were made after the gold and silver became the property of the Government, while in the case at bar the interstate shipment occurred while the product was still the property of the mine and before it reached the mint.

■ Appellee further contends that under the Gold Reserve Act of 1934, 31 U.S.C.A. §§ 440–446, 48 Stat. 337, and the regulations issued thereunder, gold is no longer actually an article of trade or commerce and that its production and interstate shipment cannot therefore be regarded as an article of commerce at the date of the enactment of the Fair Labor Standards Act of 1938. Such a construction would be out of harmony with the intent of congress in giving to the field of industrial relations a remedial statute, which should be liberally construed. The Treasury Department has, by appropriate regulations, authorized the sale of refined gold by producers, under proper licenses, to certain private users throughout the country for industrial, professional and artistic purposes. We cannot agree with appellee's construction that the Gold Reserve Act makes its products non-commercial in character. But even assuming, arguendo, that this contention was sound, it would not defeat jurisdiction in this case, since it is well settled that transmission through the mails is interstate commerce (International Textbook Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678, 27 L.R.A.,N.S., 493, 18 Ann.Cas. 1103), and that it is immaterial whether or not the transportation is commercial in character. Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119; Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168. The Fair Labor Standards Act has been held applicable to goods which never came into competition with goods in other States. Atlantic Co. v. Walling, 5 Cir., 131 F.2d 518; Chapman v. Home Ice Co., 6 Cir., 136 F.2d 353.

The remaining controversy in the case rests not so much upon any law involved as upon the facts. The issue is: Were the appellants suffered or permitted to work in their free time during each shift under such circumstances and in such manner as would bring this case within the provisions of the statute relied upon. The determination of the facts involves the credibility of the witnesses and the weight to be given to the evidence which concededly was conflicting.

Appellants contend they worked eight hours every day for six days a week and that they are entitled to compensation for the additional hour above seven hours for each day for which they were not paid, at time and one-half for overtime. Appellants claim to come within the definition of the term "employ" as defined by subdivision (g), Section 203 of Title 29, U.S.C.A., 52 Stat. 1060.

Briefly summarized, appellants' claim is that they were employed eight hours per day, notwithstanding a notice posted by the appellee that the employees should work but seven hours each shift, relieving each other one hour for lunch, prior to April 23, 1941, and another notice posted on that day to the effect that thereafter solution men would take 49 minutes and ball men 48 minutes for lunch, and notwithstanding that time cards were filled out by the employees themselves, and that accordingly solution men were paid for seven hours plus time and one-half for 11 minutes and the ball men were paid for seven hours plus time and one-half for 12 minutes. Appellants assert they were in and about the mill and place of employment during eight consecutive hours of each shift, taking less than the time designated by appellee for lunch and being present for the purpose of fulfilling their responsibilities for the continuous and satisfactory operation of the mill and that thus they come within the provisions of the statute.

On the other hand, appellee's position is that prior to April 23, 1941, all appellants who had been employed during such period had available to them a full hour's free time within which to eat their lunch or otherwise occupy their time as they pleased. Appellee contends that after April 23, 1941, in order to comply with an agreement under which the employees would receive an increase in pay of $1.50 per week, the lunch period was reduced to 48 or 49 minutes, depending upon the work the men performed, and the men were paid overtime for these extra eleven or twelve

minutes of each day; that during the period of free time all the men had such 48 or 49 minutes daily available to them, free of duties. Appellee further contends that this time was utilized by the appellants for their own benefit, except where they actually did work overtime and that such overtime was shown on their time cards which were made out by themselves daily; that no demand was ever made by any of the employees for the overtime sued for until after they had ceased their employment with appellee. Its position is that appellants have been fully compensated for all work performed.

At the time these appellants went to work at the mill there was posted on the office walls a notice dated December 29, 1939, the pertinent portions of which we quote:

"Attention Mill men    December 29th, 1939

The Following Rules Will Be Observed in the Mill:—

1. The solution man on shift will be in charge of the mill and will be responsible for same.

2. Men will work seven hours shifts, relieving each other one hour for lunch. For example; the ball mill operator will relieve the solution man from 11:00 to 12:00 and the solution man will relieve the ball mill man from 12:00 to 1:00. The operator relieving will be responsible for the other operator's work as well as his own. This applies except in the case of emergency, when other relieving hours can be arranged."

In accordance with the agreement reached on April 22, 1941, there was posted in the mill the following:

"Notice to Mill Employees on Daily Wage Basis

To comply with the agreement reached April 22nd, 1941 whereby overtime arrangements were to be made to enable employees to earn $1.50 more per week, the following schedule has been worked out:

Solution men:

Your shift including the lunch period will be 8 hours as it always has but instead of taking one hour for lunch you will take 49 minutes.

On your time cards mark Daily rate $6.35 but under time worked put 7 hours plus 11 minutes overtime. This will result in an increase of $1.50 per week.

Ball Mill Men:

Your shift including the lunch hour will be 8 hours as it always has but instead of taking one hour for lunch you will take 48 minutes.

On your time card, mark daily rate $5.85, time worked 7 hours plus 12 minutes overtime. This will result in your earning $1.50 more per week."

The rest of the notice is not pertinent here.

The appellants knew of these notices and were familiar with their contents.

Excerpts from the testimony of the witnesses will indicate the nature and extent of the conflict in the evidence before the trial court.

Al C. Fox, one of the appellants, testified that the mill was in operation twenty-four hours per day, for three eight-hour shifts; that he worked a continuous eight-hour shift; that he had no fixed eating period but ate his lunch whenever he felt hungry or whenever he would have time to eat; that he was not relieved for a lunch period; that similar conditions prevailed during each shift which he covered and that he had worked on each shift at various times. Fox further testified that while his daily operating reports covered eight hours per day, his daily time cards reported only seven hours (until April, 1941) and seven hours and eleven minutes after that date, and that the discrepancy was due to the fact that they were notified by the management to make the time cards out for seven hours (until April, 1941), and seven hours and eleven minutes after that date. Mr. Fox also testified that he could never take any time away from attention to his work because his duties required him to keep his mind on the mill all the time; that he ate his lunch in the mill in close proximity to his work, because at times something would come up that required attention and he would quit eating lunch and attend to it; that it was not possible for him to be any distance from the mill during any period of the eight-hour shift and give his attention to the mill, and that his attention to his work was continuous from the time he came on shift and relieved the previous shift because he was responsible for his work in the mill for the full eight hours. Fox stated that he had worked at various times with all the other plaintiffs who were not present to testify and that their routine

of work and practice regarding lunch was the same as his.

On cross-examination, Mr. Fox testified that although the management had posted notices about regular lunch hours, which stated that the men on duty would relieve each other during lunch periods, as a matter of fact the men were not equally acquainted with the duties of each job and the mill required the constant attention of each man for eight hours during the shift; that on occasion the mill superintendent would require him, while he was eating his lunch, to help start the compressor or do other things in the mill; and that while it was not the routine of the mill men, in case of breakdown in the mill, to repair the breakdown, he was supposed to report any breakdown that occurred.

Mr. Fox further testified that an experienced mill man's job is not all manual; that about 50 per cent of his work is watching and knowing when something is wrong and keeping things from going wrong.

With respect to the notices relative to responsibility of the solution men and lunch periods, the witness testified that the rules were not observed and the company failed to enforce them.

The testimony of H. M. Childers and Warren S. Morden, two other appellants, with respect to the degree of responsibility of the mill employees, the time taken for lunch, and the hours of work on each shift, was substantially the same as that of Mr. Fox.

In view of the stipulation entered into between the parties, we assume the testimony of other appellants, not present at the trial, would be the same as that of the appellants testifying.

For appellee, Mr. Dobson, its manager, testified that prior to April 23, 1941, the men were free for their full noon hour lunch period; that subsequent to that date, as far as the management was concerned, the employees also were free during the lunch period; that this was emphatically his instruction; that while an employee was eating his lunch he had no responsibility; that he never felt that the men could be required to perform any work during their free periods, and that if they were called upon and did work they were to be paid for it; that any man who worked extra time, "all he had to do was to put it on his time card and he would be paid for it"; that if they had worked during the lunch period

and had put it on their cards they certainly would be paid; that none of the appellants ever put in a claim for the extra time now sued for; that he did not know of any employee who had given any service during the lunch period. He testified that before the men came to work they were told they had seven hours to work and they had an hour off and it was left up to them whether they took it all at once or part of the time for the lunch period and part time for a shower or to walk about; they had seven hours to put in work and how they spent their free period was up to them; the company had no jurisdiction over that; that the rules that had been put up in the mill relative to time off were generally observed.

Mr. Clausen, the mill superintendent, testified to the effect that in so small a mill one man on each shift could handle the work and that one man could therefore relieve the other for any necessary period; that only about 50 per cent of these men's time was occupied in manual labor, the remaining part of their working time being devoted simply to overseeing the various machines and processes to see that the mill was functioning properly. He further testified that there was no set time for the employees to eat lunch; that at times he saw employees reading and sitting around and when he spoke to them about it he was told that this was part of their time off; "I never bothered them when they told me that"; that it often happened that when a man was questioned while sitting and reading he would say it was part of his time off for the noon hour; that the employees were not subject to call during their lunch hour; time off was to be taken when most convenient to the employees; the men could go away from the property during their free time; they could do as they pleased.

To sustain their position on the point under discussion, appellants rely principally upon the interpretation of the term "employ", as defined in the Act, Section 203(g), U.S.C.A., Title 29, 52 Stat. 1060, the pertinent part of which reads:

"Section 203. Definitions. As used in sections 201–219 of this Title * * *

"(g) 'Employ' includes to suffer or permit to work."

The evidence clearly establishes that the work was such that the men on shift could easily relieve each other during the lunch

or free time period, as set forth in the notices, without any burden or hardship on the employees and without retarding the efficient operation of the mill.

Appellants constantly repeat the statement that they were employed to work a continuous 8-hour shift. While it is correct that the operation of the mill was continuous during these 8-hour shifts, it is not admitted that each employee worked the eight hours, but appellee's testimony is that during free time only one man was actually engaged in keeping the mill in operation.

Appellants' argument seems almost to go to the extent of maintaining that the mere fact that employees were permitted to remain in or about the mill during the lunch period, or perchance that during such time they may have voluntarily performed some emergency service, that such circumstances would be sufficient to bring appellants within the provisions of the Act, notwithstanding the rule of the company as to free time or the further fact that the management assumed that any such occasional emergency service was charged as overtime by the worker on his time card and paid for as such. In this connection we call attention to the fact that the mill men employed by appellee made out their own time cards showing the hours worked on each shift. These cards were signed by the solution man who was in charge of the mill during the shift, and at some later date by the mill superintendent. In none of the time cards made out by appellants here involved was there any overtime claimed, which was not paid for by appellee, prior to this action.

Having employed the men, of course the management knew they were working, but it is admitted that the employees could take their free time off, as contemplated in the notice, at any time agreed upon by them, and there is substantial evidence that the manager and superintendent did not know that any time for which claims are now being made was overtime work; and the superintendent testified that on occasions when he saw the men, as he thought, idle, upon his calling attention to it the particular employee would inform him that he was merely putting in his free time.

■ The answer to appellants' argument that appellee suffered or permitted them to work is that in our opinion the words "suffer" and "permit" as used in the statute means "with the knowledge of the employer."

■ The evidence in the record would not require a finding that any of the overtime asserted as a claim here was performed with the knowledge of the officers of appellee, or that appellants were knowingly suffered or permitted to work in contravention of the statute.[2]

■ The distinction which must be kept in mind in this class of cases between "working" and "being available for work" is indicated in the case of Skidmore v. Swift & Co., 5 Cir., 136 F.2d 112, 113, where the court said: "The Act does not require payment of wages to an employee merely because he is away from home. Nor does the Act undertake to regulate or restrict reasonable and bona fide agreements whereby an employee agrees to be available if needed. 'Working' is not synonymous with 'availability for work'."

■ Whether the free lunch period be included as overtime, in determining this question the special circumstances surrounding this case are not to be overlooked. Here the workmen recorded on a card each day the time actually worked, all claimed overtime also being noted; and for the time entered on the card by the appellants, including any claim for overtime, they were fully paid. The keeping of the time was left to the honor of the employees. After the adoption of the Fair Labor Standards Act, the lunch period in this mill was set aside as non-working time. This appears from the notices posted in the mill, from the testimony adduced, and from the fact that the employees during their time of employment never made claim for this overtime here alleged. The employees knew from the notices before entering upon their employment that they were granted a lunch period of a certain time in which to eat and rest and that when doing so they would be relieved of their duties. In these circumstances and from the evidence submitted in relation thereto, we cannot say that the conclusion of the District Court that appellants were not working while eating lunch, resting, reading or amusing themselves during this free period was wrong.

This class of cases must be determined by the character of the work and the usual practice and custom in connection with it.

2 See Jackson v. Derby Oil Co., 157 Kan. 53, 139 P.2d 146.

Where the findings of the District Court are supported by substantial evidence and are not clearly erroneous, the judgment of the District Court should be affirmed. United States v. Foster, 9 Cir., 123 F.2d 32.

Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides in part as follows: " * * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * *"

"The findings of the court are presumptively correct and should not be set aside nor disturbed unless clearly erroneous." O'Brien's "Manual of Federal Appellate Procedure, Third Edition", page 20, and Note 17; Occidental Life Ins. Co. v. Thomas, 9 Cir., 107 F.2d 876, 878; Sapp v. Gardner, 9 Cir., 143 F.2d 423.

Affirmed.