**NATIONAL LABOR RELATIONS BOARD
v. IDAHO–MARYLAND MINES
CORPORATION.**

No. 8788.

Circuit Court of Appeals, Ninth Circuit.
July 19, 1938.

Charles Fahy, Gen. Counsel, NLRB, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, H. Gardner Ingraham, and Samuel Edes, Attys., NLRB, all of Washington, D. C., and John T. McTernan, Regional Atty., NLRB, of San Francisco, Cal., for petitioner.

Charles W. Slack and Edgar T. Zook, both of San Francisco, Cal., for respondent.

Robert M. Searls, of San Francisco, Cal., amicus curiæ for California Metal and Mineral Producers Ass'n.

Before WILBUR, GARRECHT, and MATHEWS, Circuit Judges.

MATHEWS, Circuit Judge.

The National Labor Relations Board has petitioned this court for enforcement of the Board's order of January 10, 1938, requiring respondent, Idaho-Maryland Mines Corporation, to cease and desist from certain unfair labor practices found by the Board to have been engaged in by respondent, and to take certain affirmative action. Respondent moves to dismiss the petition, on the ground that the Board had no jurisdiction to issue the order.

■ Whatever jurisdiction the Board has in such matters is conferred by § 10 of the National Labor Relations Act (29 U.S.C.A. § 160).[1] Section 10 does not deal with, or empower the Board to deal with, or to issue orders concerning, unfair labor practices in general. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 31, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352. The Board's jurisdiction extends only to unfair labor practices "affecting commerce." The "commerce" referred to is defined in § 2 of the Act (29 U.S.C.A. § 152):

"The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country."

■ The "commerce" thus defined (aside from that in a Territory or the District of Columbia) is "interstate and foreign commerce in the constitutional sense."[2] National Labor Relations Board v. Jones & Laughlin Steel Corp., supra (page 621).

Section 2 also defines the term "affecting commerce":

"The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

Unfair labor practices found by the Board to have been engaged in by respondent were: (1) Interfering with, restraining and coercing respondent's employees in the exercise of their right to self-organization, their right to form, join or assist labor organizations, their right to bargain collectively through representatives of their own choosing, and their right to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection; (2) dominating, interfering with the administration of, and contributing support to, a labor organization of which some of respondent's employees were members; and (3) discouraging membership in another labor organization, by discrimination in regard to hire and tenure of respondent's employees.

The question is whether these unfair labor practices were unfair labor practices "affecting commerce", within the meaning of § 2, supra.

Facts concerning which no dispute exists are as follows:

Respondent was at all pertinent times, and is now, engaged in the business of mining gold and silver at Grass Valley, California, and Forbestown, California. All employees who were or could have been affected by respondent's labor practices were employed in said business. Said business was and is conducted wholly and exclusively within the State of California.

Respondent's supplies and equipment are purchased by it in the State of California. Some, however, though purchased in California, originate elsewhere. Purchases by respondent of supplies and equipment manufactured outside the State amount to approximately $125,000 annually.

Respondent does no smelting or refining. Its product is a natural alloy of gold

---

[1] Section 10 empowers the Board "to prevent any person from engaging in any unfair labor practice (listed in section 8 [of the act, 29 U.S.C.A. § 158]) affecting commerce." Section 8 lists, among others, the unfair labor practices found by the Board to have been engaged in by respondent.

[2] The Constitution (Art. 1, § 8, U.S.C.A.Const. art. 1, § 8, cl. 3) calls it "Commerce with foreign Nations, and among the several States."

and silver. Respondent transports the major portion of its product by its own airplanes to San Francisco, California, and there sells and delivers it to the United States mint. It sells the rest of its product to a refinery at Selby, California, which refines such product, pays respondent the current Government price therefor, less refining charges, and, in turn, sells the refined gold and silver to the San Francisco mint. Respondent has not, since passage of the Gold Reserve Act of 1934,[3] shipped or sold any of its product to anyone except the San Francisco mint and the refinery at Selby.

In 1936 respondent produced and sold to the San Francisco mint, in conformity with Federal regulations, 95,756 ounces of gold and 29,238 ounces of silver, receiving in payment for the gold $3,351,470.18, and for the silver $22,680.54. From January 1, 1937, to April 30, 1937, respondent produced and sold to the San Francisco mint 34,998 ounces of gold and 10,919 ounces of silver, receiving in payment for the gold $1,224,930, and for the silver $8,407.

Upon receipt by the mint, respondent's product is assayed and paid for at the current Government price, less refining charges. For about 30 days respondent's product is kept segregated by the mint. Thereafter it is refined, the gold and silver are separated, and each is transformed into bars. In this process respondent's product is commingled with that of various other producers, and its identity is destroyed. Under the present policy of the Treasury Department, all bars of refined domestic gold, as they accumulate at the San Francisco mint, are from time to time shipped to the United States mint at Denver, Colorado. In addition, unrefined gold and silver bars are also shipped in substantial quantities to the Denver mint.

The Board found as a fact that the unfair labor practices engaged in by respondent had a close, intimate and substantial relation to interstate and foreign commerce and tended to lead to labor disputes burdening and obstructing such commerce and the free flow thereof.[4] Thereupon, as a matter of law, the Board concluded that these were unfair labor practices "affect-

ing commerce," within the meaning of § 2, supra.

■ The finding is not supported by evidence. Respondent's activities—including its labor practices—are wholly intrastate. It buys nothing, sells nothing, ships nothing, and nothing is shipped to it, in interstate or foreign commerce. That respondent is not, itself, engaged in interstate or foreign commerce is conceded. There is no evidence that its activities have any close, intimate or substantial relation to such commerce, or that such commerce or the free flow thereof would be obstructed by any dispute to which respondent's labor practices might lead.

■ There is no merit in the Board's contention that purchases by respondent, in California, of supplies and equipment manufactured in other States are so closely, intimately and substantially related to interstate commerce as to warrant the Board's assumption of jurisdiction in this case. Such supplies and equipment are not sold or shipped to respondent in interstate commerce. They are not sold or shipped by respondent in interstate commerce or at all. The relation, if any, between interstate commerce and respondent's purchases of supplies and equipment is indirect, remote and unsubstantial.

■ Nor is the Board's assumption of jurisdiction warranted by the fact that the United States, after purchasing respondent's product and commingling it with other gold and silver, ships the commingled product from its San Francisco mint to its Denver mint for safe keeping. Respondent does not make these shipments or cause them to be made. We regard such shipments, not as commercial transactions, but as administrative acts of Government. If, however, such acts may be said to constitute commerce, it is a commerce to which respondent's activities are not closely, intimately or substantially related, and which respondent's labor practices do not directly or substantially affect.

The Board asserts, without proof, that respondent's production of gold is "the production of that upon which not only domestic but world trade is based and se-

---

[3] Act of January 30, 1934, c. 6, 48 Stat. 337. By this Act, commerce in gold—intrastate, interstate and foreign—is greatly restricted.

[4] The Board did not find that respondent's labor practices were "in" interstate

or foreign commerce, or that they had actually burdened or obstructed, or led to a labor dispute burdening or obstructing, such commerce or the free flow thereof, but only that they tended to lead to such a dispute.

cured;" that, "Interstate and foreign commerce being so vitally dependent upon and so delicately adjusted to gold, necessarily the supply of gold critically affects that commerce;" and that respondent's production of gold "constitutes the very life-blood of commerce, any interference with which would have drastic repercussions in interstate and foreign commerce."

 On the basis of these unproved and, we think, unprovable assertions, the Board asks us to hold the National Labor Relations Act applicable to respondent. This we decline to do. Jurisdiction of respondent's labor relations cannot be predicated upon the fact that it happens to be a producer of a metal which, in former times, was used as money, and which, in this country, still bears some relation to money. If that were sufficient to confer jurisdiction, every employer who pays wages, buys goods or spends money for any purpose—in other words, all employers—would be subject to the Act, which manifestly is not the case.

Cases cited by the Board as justifying its assumption of jurisdiction have no such effect. In National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, the employer was engaged in Pennsylvania in the business of manufacturing iron and steel products from raw materials most of which it brought in from other States, and 75% of its manufactured products were, by the employer, shipped out of Pennsylvania and sold in other States and foreign countries. In Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954, the employer was engaged in California in the business of canning and packing fruit and vegetables, and 37% of its pack was, by the employer, shipped out of California and sold in other States and foreign countries. In National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138, the employer was engaged in the State of Washington in the business of manufacturing lumber, and 90% of its product was, by the employer, shipped out of Washington and sold in other States and foreign countries. We are here dealing with a California employer which ships nothing, sells nothing, buys nothing, outside of California.

In National Labor Relations Board v. National New York Packing & Shipping Co., 2 Cir., 86 F.2d 98, the employer was engaged in New York in the business of acting as agent for out-of-State buyers in consolidating shipments of packages to such buyers and arranging for transportation thereof in interstate commerce. In Consolidated Edison Co. v. National Labor Relations Board, 2 Cir., 95 F.2d 390, the employer was a public utility furnishing gas and electricity both to local consumers and to those engaged in interstate commerce, among others, to three interstate railroads, whose terminals and trains would cease to operate if the employer's service were discontinued. These cases, obviously, are not in point.

Respondent's motion is granted, and the Board's petition is dismissed.