## BARKSDALE v. FORD, BACON & DAVIS, Inc.

### Civil Action No. L. R.–1323.

District Court, E. D. Arkansas, W. D.

Feb. 21, 1947.

Catlett & Henderson, Leon B. Catlett and E. DeMatt Henderson, all of Little Rock, Ark., for plaintiff.

Owens, Ehrman & McHaney, E. L. McHaney, Jr., and John M. Lofton, Jr., all of Little Rock, Ark., for defendant.

LEMLEY, District Judge.

This is an action under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., for overtime compensation, liquidated damages and attorneys' fees, brought against the defendant Ford, Bacon & Davis, Inc., by the plaintiff Guy W. Barksdale and 26 other men who were employed in supervisory capacities in the operation of the Arkansas Ordnance Plant during the late war.[1]

The Arkansas Ordnance Plant, situated near Jacksonville, Arkansas, was one of a large number of similar plants engaged during the war, under a cost-plus-a-fixed-fee contract, in the processing and assembling of ammunition for the United States, all supervised by the Ordnance Division of the War Department, and under the management of various corporations, in the present case the defendant, Ford, Bacon & Davis, Inc.

The plaintiffs[2] bottomed their action on the ground that they were engaged in the production of goods for commerce, within the meaning of Section 207 of the Act; no contention was made that they were engaged in commerce. The action as to all of them was defended on the ground that they were not engaged in the production of goods for commerce, and hence not covered by the Act; and as to all of them except Barksdale it was further contended that they were employed in bona fide executive or administrative capacities and hence exempt from the provisions of the Act. In the case of Barksdale, the defendant admitted that he was not an administrative employee, nor employed in a bona fide executive capacity since his hours of work of the same nature as that performed by those under him exceeded twenty per cent.

---

[1] The case was originally styled Jim Bradford et al. v. Ford, Bacon & Davis, Inc.

[2] The word "plaintiffs" as used in this opinion also includes intervenors.

The issue of fact with respect to the contention that all of the plaintiffs except Barksdale were exempt employees was submitted to a jury, the Court reserving its decision on the question of coverage. A verdict was rendered for the defendant, thereby disposing of the case as to all of the plaintiffs except Barksdale. His case has now been submitted to the Court without the intervention of a jury, and the Court, based on the defendant's admission above referred to and evidence which is virtually undisputed, has made and filed herein its findings of fact. The findings pertinent to this opinion are:

## Findings of Fact

1. * * *

6. The Arkansas Ordnance Plant was an ordnance facility owned by the United States Government. It was constructed during the war for the production of munitions such as detonators, percussion elements, artillery primers, fuzes, boosters, and powder train fuzes, for use by the Government in the prosecution of the war.

7. The United States, by written contract, retained the defendant, Ford, Bacon & Davis, Inc., to recruit labor and other personnel for and to manage the operation of the Ordnance Plant. The defendant was paid a fixed fee for this service, and the Government paid all expenses of operation, including the cost of labor and materials.

8. At all times involved in the complaint, the premises upon which plaintiff was employed, the tools and equipment which he and all others working on the premises were using in their employment, and the property and products with which they dealt in such employment were all the property of and belonged to the United States.

9. The component parts of the detonators, percussion elements, artillery primers, fuzes, boosters, powder train fuzes, and other products with which employees at the plant dealt were shipped to the plant as the property of the United States "for military use," and title to and possession thereof remained in the United States during all times relevant hereto.

10. The finished products of said plant were the property of the United States and were by it shipped under Government bills of lading to military facilities without the State of Arkansas for use by the armed forces of the United States in the war with Germany, Italy, Japan, and other nations. Some shipments went directly overseas, and others went to military facilities located within the United States.

11. The defendant at no time had title to the finished products of the plant, and at no time had title to any of the component parts of such products, or of the materials, supplies, machinery, equipment, or other property used in connection with the contract, title thereto and possession thereof being at all times in the United States and subject to its sole control.

12. The Government did not purchase munitions from the defendant.

13. The defendant did not sell munitions to the Government or to any other party.

14. No munitions or other products were manufactured or processed at the Arkansas Ordnance Plant except from materials belonging to the Government, and all such munitions and other products were by the Government used in the prosecution of the war.

15. The United States furnished and shipped to the Arkansas Ordnance Plant approximately 95% of all materials, supplies, machinery, equipment, and other property used in connection with the contract for operation of the Arkansas Ordnance Plant. Title to the remainder of the materials, supplies, machinery, equipment, or other property, which were purchased after approval by the Government through the agency of the defendant, vested in the United States at their points of origin, and they were shipped to the Arkansas Ordnance Plant on Government bills of lading, marked "Government property for military use."

16. A Government Finance Officer in Washington, D. C., paid the freight on such bills of lading.

17. The United States had title to and possession of all materials, supplies, machinery, equipment, and other property

used in connection with the contract for operation of the Arkansas Ordnance Plant at all times relevant hereto.

18. The United States maintained an Accountable Property Officer to be accountable for all property used in connection with the contract between the Government and the defendant.

19. Prior to the time the plant actually began operating the United States advanced to the defendant a large sum of money to defray anticipated operating expenses. As money was withdrawn from this fund it was replenished by the Government. The defendant was not required to use any of its own money in carrying out its contract with the Government.

20. The Government contracted for electric power, and telephone, telegraph, and teletype service at the plant, and paid such bills directly. The defendant was appointed an agent of the Government for the purpose of causing official business messages to be transmitted.

21. The plant was under the direct control and supervision of the Chief of Ordnance, United States Army. A Commanding Officer appointed by the Chief of Ordnance was on duty at the Arkansas Ordnance Plant at all times relevant hereto, and exercised full and complete control over the property and the installations thereon.

22. The United States had exclusive jurisdiction over the premises embracing the Arkansas Ordnance Plant.

23. The Government retained the right to approve or disapprove the employment of all personnel and exercised this right.

24. The Government approved all wage and salary rates, and all promotions or other changes of status of employees were required to be approved in advance by the Government.

25. All munitions manufactured or processed at the plant were manufactured or processed under the direct supervision and control of the Government.

26. The Government specified the manufacturing processes to be used. It directed the type and quantity of munitions, the specifications thereof, and the rate of production. Inspections were made by the Government during each step of their manufacture or processing. Detailed rules and regulations governing safety and methods of production were promulgated by the Government. The defendant was required to comply with these rules and regulations, and Government-paid employees were present to report on compliance.

27. The Government, from time to time, sent to the defendant production schedules directing the defendant to produce munitions of certain designated specifications. The defendant was required to meet these schedules. It had no discretion as to the type of munitions to be made, the quantity thereof, or the method or process used in their manufacture, and the defendant produced no munitions except as required by Government directive.

28. On occasion the Government transferred production schedules from other ordnance plants to the Arkansas Ordnance Plant for completion. In such cases, if the original plant had made any contracts for materials and supplies on account of such schedules, the defendant was required to take over such supply contracts and to pay the vendors in accordance therewith from Government funds.

29. The defendant was not penalized if the materials manufactured or processed at the plant did not meet specifications and could not be used. Under the contract between the defendant and the Government, the defendant was allowed all costs of reworking rejected munitions and all costs of material finally rejected.

30. Of the direct materials used in the manufacture of munitions, the Government furnished materials of the approximate value of $275,768,000, and the defendant purchased and paid for with Government money materials of the approximate value of $9,574,602.34.

31. The purchase of materials, supplies, machinery, tools, equipment, or other property acquired through the agency of the defendant was first approved by the Government. The Government took title to such goods at their points of origin, and the goods were shipped on Government bills of lading to the contracting officer in care of the defendant.

32. The Government audited in advance all time cards and payrolls, and witnessed the actual payments to employees.

33. The defendant paid wages and salaries of employees by check against a bank account furnished by the Government.

34. No sales tax was paid on materials purchased for use at the Arkansas Ordnance Plant, no property taxes on real or personal property of the Arkansas Ordnance Plant were paid to the State or the county, and no license or registration fees were paid on motor vehicles used in connection with the operation of the plant.

35. Employees traveling on business connected with the operation of the plant traveled on tax-free transportation tickets and for that purpose were authorized to state that they were on Government business.

## Opinion.

Based on these findings of fact, the defendant contends that the plaintiff is not within the coverage of the Act because (1) the defendant was merely an agent of the Government in the assembling and processing of said munitions, and hence the plaintiff was at all times an employee of the United States and as such exempt from the provisions of the Act, and (2) because the plaintiff was not engaged "in the production of goods for commerce" within the meaning of the Act, inasmuch as the term "goods" as used in said phrase does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof, other than a producer, manufacturer or processor thereof, and the Government was the ultimate consumer; and because the term "commerce" used in said phrase does not include the shipment across state lines by the Government of Government-owned munitions of war to military facilities, to be used in the prosecution of the war; such transaction not constituting "commerce" but an administrative act of the Government exercised in its sovereign capacity.

The provisions of the Act peculiarly applicable to these contentions are as follows:

"No employer shall * * * employ any of his employees who is engaged in * * * the production of goods for commerce" without complying with the provisions of the Act. Sec. 207(a).

" 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States * * *." Sec. 203(d).

" 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." Sec. 203(i).

" 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." Sec. 203(b).

We will proceed to a discussion of the defendant's second contention, based on the construction of the words "goods" and "commerce" as used in the phrase "production of goods for commerce," since the conclusions we have reached in that regard render it unnecessary for us to pass upon its first.

■ Section 3(i) of the Act, 29 U.S.C.A. Sec. 203(i), provides that the term "goods" as used in the phrase "production of goods for commerce," "does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." The Arkansas Ordnance Plant was in its entirety the property of the United States. Practically all of the materials that went into the munitions were furnished by the Government and were shipped to the plant as the property of the United States, for military use. This included powder, metal and other materials that formed a part of the munitions. This was known as free issue material. The remaining materials, which were used in the main in the fabrication, packing and shipment of the munitions, were purchased by the defendant from outside sources, and all these materials became

the property of the Government at the point of purchase, and were shipped from the point of purchase to the "Ordnance Property Officer, care of Ford, Bacon & Davis, Inc., Arkansas Ordnance Plant, Jacksonville, Arkansas." Thus the plaintiff was at all times working on goods of the Government, with machines of the Government, and on Government property, the title to which and the possession of which remained in the United States at all times. After these goods were worked on by the plaintiff, the United States shipped the same under Government bill of lading to military facilities outside of the state. If it can be said that the goods were in the constructive rather than actual possession of the Government while they were being processed, they were certainly in the actual physical possession of the Government · when they were shipped. The goods in question were munitions of war and were manufactured for the purpose of being consumed by the United States in the prosecution of the war. Hence the United States in our opinion was the ultimate consumer thereof within the meaning of the Act, and the plaintiff was not engaged in the "production of goods for commerce."

This point appears not to have been raised in the cases relied upon by the plaintiff, which will be hereinafter referred to, and there is but little authority thereon.

In Divins et al. v. Hazeltine Electronics Corporation et al., D.C.S.D.N.Y., 70 F. Supp. 686, the plaintiffs were employed by the defendant to install on warships, and service, radar equipment which was the property of the United States Navy. The equipment had been previously delivered to the United States and was in the actual possession of the United States at all times, and plaintiffs' services were utilized in connection therewith. The case was submitted to the Court on defendants' motion for summary judgment, which motion was sustained on the ground that the plaintiffs were not engaged in the production of goods for commerce because the United States was the ultimate consumer of the equipment upon which the plaintiffs were working. We quote at length from the Court's opinion:

"The controversy here centers principally around the question whether plaintiffs were engaged in the production of goods for interstate commerce. And this turns upon whether the radar equipment, the goods, upon which plaintiffs worked had been delivered to and was at the time in the actual physical possession of the ultimate consumer thereof. There is no claim that the actual physical possessor was a producer, or a manufacturer, or a processor of the equipment.

"Defendants allege in their moving affidavits that the radar equipment had been delivered to the United States prior to the times, and was in the actual physical possession of the United States at the times, that plaintiffs' services were utilized in connection therewith. Plaintiffs do not deny these allegations but describe them as bare conclusions and insufficient upon this motion to show such delivery and possession. However, in their answering affidavits they admit that they were employed by defendants to perform, and did perform, services in installing, servicing and maintaining radar equipment under contracts which defendants had with the United States, or with others who had made similar contracts with the United States, to render such services, and that their services were rendered at various United States naval establishments and upon various types of warships owned by the United States. I think that delivery and possession are sufficiently shown. If the facts be otherwise, plaintiffs should have made some attempt to show it.

"But, instead of doing so, they rely upon the arguments that the radar equipment had not been fully completed at the time of its claimed delivery to the United States, for, if it had been completed, there would have been no necessity for plaintiffs to work upon it; that the equipment was useless and incapable of use unless and until it was installed and serviced by plaintiffs; that, so long as defendants' employees were working on the equipment, defendants still had the actual physical possession of it and there could be no delivery; and that the ships in which the equipment was being installed had not themselves been completed.

"All these arguments are specious. There is no requirement in Section 3(i) of the Act that the goods' shall have been completed prior to delivery. This Section defines goods as including 'marine equipment, * * * or articles or subjects of commerce of any character, or any part or ingredient thereof.' Though the equipment may have been incapable of use until installed, it was, nevertheless, marine equipment. Many articles, such as gas stoves, electric refrigerators, etc., are completed articles but incapable of use until installed and connected. Plaintiffs do not claim that the radar equipment was not completed before it was shipped from the plant; all that they claim is that it first had to be installed. The work of installing this equipment must have been a very small part of plaintiffs' services, for in their answering affidavits they swear that 'approximately 50% of all my work was to grease and oil moving parts of the equipment * * * and almost all of my remaining work was actually radio servicing.' The argument that, so long as plaintiffs were working on the equipment, defendants still had actual physical possession of it, is a non sequitur. Whether the ships had themselves been completed is of no consequence in this connection."

"I have no doubt that the radar equipment had been delivered to, and was in the actual physical possession of the United States. Nor have I any doubt that the United States was the ultimate consumer thereof.

"Plaintiffs also claim that they were engaged in commerce, as distinguished from being engaged in the production of goods for commerce, because the ships in which the radar equipment was installed, were 'used in the conduct of the war and were thus engaged in interstate commerce,' and, 'whether in peacetime or in wartime, ships are vital instrumentalities of commerce.' I do not think that this argument is sound. Prosecution of a war is not commerce. War is the negation of commerce. Often the purpose of a war and the result, usually, is to impair or destroy commerce, not to carry it on. True, in the prosecution of the war warships transport men, munitions, food for crew and troops and supplies for civilians. Literally speaking, this is commerce but it is purely incidental to the main purpose for which the warships are being used."

"In my opinion plaintiffs are not within the coverage of the Act because they were not engaged in commerce and, so far as they were engaged in the production of goods for commerce, the goods upon which they worked were in the actual physical possession of the ultimate consumer which was not a producer, manufacturer, or processor thereof.

"The motion for summary judgment should be granted. Settle order on two days' notice."

■ Nor do we think that the term "commerce" as used in said phrase can logically be construed to include a shipment across state lines by the Government to its military facilities of Government-owned munitions of war to be used in the prosecution of the war.

The authorities on this point are in conflict, and it is an open question in the Eighth Circuit. The point was raised and argued in the appellees' brief (which we have seen) in Smith et al. v. Porter et al., 143 F.2d 292, wherein the District Court held that the plaintiffs were exempt employees under the Act, and the plaintiffs appealed. The Circuit Court of Appeals affirmed the District Court's decision on the merits, and made no reference to this question in its opinion.

In the Arkansas State Courts, such Governmental transportation is construed not to be "commerce," but an administrative act of the sovereign.

In the early case of Matlock v. Sanderson & Porter, C.C.H. 7 Labor Cases, Paragraph 61,806, Judge Parham of Jefferson Circuit Court said:

"In addition, this Court is of the opinion that the manufacture of munitions of war by the Government and the transportation thereof by the Government to points where needed, either in the United States or abroad, is not commerce as defined by the Fair Labor Standards Act, but is an administrative act by the sovereign."

The Supreme Court of Arkansas in the late case of H. B. Deal & Co., Inc. v. Leonard et al., Ark., 196 S.W.2d 991, 994, decided October 21, 1946, held that employees of a corporation engaged in the construction of the Ozark Ordnance Works, near El Dorado, Arkansas (which plant was designed and constructed by the Government for the manufacture of ammonia and ammonium nitrate to be used in the manufacture of munitions of war, and which product was to be shipped by the Government outside of the State), were not engaged in the production of goods for commerce. We quote from the opinion of the Court:

"But appellees insist that, if they were not engaged in commerce, they were engaged in the production of goods for commerce. This argument is based on the fact that the Plant was to be used in the manufacture and shipment of ammonium in commerce when completed, which is, in our judgment a false assumption, since the Government would use the product of the Plant for the manufacture of munitions to be used in the prosecution of the war in which we were then engaged, and, while it would cross State lines, the Government is the sum of all the States and of itself knows no State lines in the manufacture and shipment of war material. Moreover, the Act does not purport to apply to the Government. It applies to employers of labor who are engaged in commerce. It says: 'No employer shall * * * employ any of his employees who is engaged in commerce,' etc. Clearly, it has no reference to the Government."

In the recently decided case of Kennedy et al. v. Silas Mason Co., D.C., 1946, 68 F. Supp. 576, 582, Judge Dawkins, of the United States District Court for the Western District of Louisiana, had under consideration an action brought under the Fair Labor Standards Act by certain plaintiffs against the defendant company, a cost-plus-a-fixed-fee Government contractor, based upon labor performed by them in the operation of the Louisiana Ordnance Plant. The facts were similar to those in the instant case. Judge Dawkins held that the plaintiffs were not engaged in the production of goods for commerce. He based his decision on different reasoning from ours, but in the course of his opinion he said:

"Had defendant been engaged in the business of manufacturing munitions of war, either as a general proposition, or under contract by which it agreed to produce and sell to the Government, either at fixed prices or at prices to be set from time to time, the situation would have perhaps been different, and the Fair Labor Standards Act as well as other laws pertaining to labor, prices, material, etc., might have come into play. Overtime and other expenses of the producer or manufacturer from whom the Government purchased would simply have been added to the prices which the Government had to pay, just as was done when it purchased materials, supplies, etc., for carrying on the war. In this latter situation both the employers and employees who made the goods, although for the Government, were engaged in commerce, within the meaning of the law, where the goods moved from one state to another or overseas. On the other hand, in these cases and all others like them where the Government, instead of going into the market and paying for manufactured or raw materials, chose to furnish its own materials and to have its munitions made and shipped from its own plants, paying all expenses in the form of reimbursements to the contractor, plus a fixed fee for the latter's knowledge and skill in the operation of the plants, although declining to become responsible directly for labor, materials or other obligations of the contractor, it is my view, that the same did not constitute commerce. Of course, the Fair Labor Standards Act and all other laws did apply to purchases from private concerns of raw materials of unfinished parts and supplies from which the shells and munitions were made, before they were delivered to the Government, and in those cases where they had to move from one state to another for delivery to the Government. At the same time the finished shells and munitions made at the plant were the Government's property at all times and were physically delivered to it there before being shipped to the battlefronts."

The late Judge Merrill E. Otis, of the Western District of Missouri, in Trefs v.

Foley Bros., Inc., C.C.H. 7 Labor Cases, Paragraph 61,743, made the following observation:

"I doubt if the Supreme Court of the United States will ever say that the production of goods for the use of the United States, even although they are transported by the United States from one state to another, is a production of goods for interstate commerce. I doubt that very much, but it is unnecessary to pass upon that question in this case."

The Circuit Court of Appeals for the Ninth Circuit has held that the shipment by the Government across state lines of Government-owned gold and silver is an administrative act of the sovereign and is not interstate commerce.

In National Labor Relations Board v. Idaho-Maryland Mines Corporation, 9 Cir., 98 F.2d 129, 131, the facts were that the respondent was engaged in mining gold and silver in California, which minerals were sold and delivered to the Government at its mint at San Francisco in that state. Thereafter the Government shipped the product to its Denver, Colorado, mint. The question at issue was the applicability of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., to the mining company's operations. The Act applies to the activities of employers which have the intent or necessary effect of burdening or obstructing commerce by: "(a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce." 29 U.S.C.A. § 151. The Court held under the foregoing facts that the respondent was not engaged in such an activity since the transportation in question was not "commerce" but an administrative act of the Government. In the course of its opinion the Court said:

"Nor is the Board's assumption of jurisdiction warranted by the fact that the United States, after purchasing respondent's product and commingling it with other gold and silver, ships the commingled product from its San Francisco mint to its Denver mint for safe keeping. Respondent does not make these shipments or cause them to be made. We regard such shipments, not as commercial transactions, but as administrative acts of Government. If, however, such acts may be said to constitute commerce, it is a commerce to which respondent's activities are not closely, intimately or substantially related, and which respondent's labor practices do not directly or substantially affect."

It has been contended, as will be hereinafter noted, that the foregoing statement: "We regard such shipments, not as commercial transactions, but as administrative acts of Government," is dictum, because the Court thereafter stated: "If, however, such acts may be said to constitute commerce, it is a commerce to which respondent's activities are not closely, intimately or substantially related, and which respondent's labor practices do not directly or substantially affect." The Ninth Circuit Court of Appeals, however, evidently does not so regard it, as evidenced by its reference thereto in the later decided cases of National Labor Relations Board v. Sunshine Mining Co., 110 F.2d 780, and Fox et al. v. Summit King Mines, Limited, 143 F.2d 926. In the Sunshine Mining Co. case, supra, it reiterated its language used in the Idaho-Maryland case to the effect that it regarded such shipments, not as commercial transactions, but as administrative acts of Government, but distinguished that case from the one under consideration, using the following language [110 F.2d 784]:

"It is asserted that the situation in this case is exactly the same as in National Labor Relations Board v. Idaho-Maryland Mines Corporation, 9 Cir., 98 F.2d 129, 131. Without going into detail we deem it sufficient to say that the facts in that case are different from those found here. There the California mining concern sold its output to the United States in California, and the court in that case did not consider those

698

transactions as commerce at all, but in relation thereto said: 'We regard such shipments, not as commercial transactions, but as administrative acts of Government.'"

And in Fox et al. v. Summit King Mines, Limited, supra, wherein the Court was considering an action involving the applicability of the Fair Labor Standards Act to the company's employees, and where it appeared that the mining company produced gold and silver in Nevada which it sent to the mint in San Francisco, California, by mail, the title to the product remaining in the company until delivery, the Court held the Fair Labor Standards Act to be applicable, and distinguished the Idaho-Maryland case on the facts, using the following language [143 F.2d 928]:

"Appellee cites the case of National Labor Relations Board v. Idaho-Maryland Mining Corporation, 9 Cir., 98 F.2d 129, in which a contrary conclusion was reached by this court. That case has no bearing upon the case at bar because the facts in the former case were different. The Idaho Maryland Mine was located in California; the product was produced in California and was sold to a government mint located in California. Thus, the product produced by the mine did not cross state lines at any time before it reached the mint when it became the property of the United States Government. We did hold in the above case that the subsequent shipment of the gold and silver by the mint to Denver for safekeeping was an administrative act of the Government and not such a commercial transaction as would render the respondents' activities subject to the National Labor Relations Act, but those shipments across State lines were made after the gold and silver became the property of the Government, while in the case at bar the interstate shipment occurred while the product was still the property of the mine and before it reached the mint."

This principle has likewise been recognized by the Circuit Court of Appeals of the Fourth Circuit. This conclusion is justified by an analysis of the opinion of the District Court in Holland, Administrator, v. Haile Gold Mines, Inc., 44 F. Supp. 641, and of the Circuit Court of Appeals in

Walling, Administrator, v. Haile Gold Mines, Inc., 136 F.2d 102, 104. The case last cited involved an appeal from the decision in the former.

In the District Court the plaintiff, as Administrator of the Wage and Hour Division of the Department of Labor, sought to enjoin the mining corporation from violation of certain provisions of the Fair Labor Standards Act. It appeared that the mining corporation operated a gold mine near the city of Kershaw, South Carolina, whose employees were engaged in the digging and crushing of rock from which gold was later extracted; that after the gold was obtained it was delivered to the United States Post Office at Kershaw, South Carolina, and from thence forwarded to the United States Mint at Philadelphia, Pennsylvania, in pursuance of orders of the United States Government. After delivery, the United States Treasury issued a check to the company for the bullion. The District Court denied the injunction on the ground that, since the shipment of the gold from the Post Office in Kershaw, South Carolina, to the mint in Philadelphia, Pennsylvania, was made pursuant to orders of the United States Government, such constituted an administrative act of the Government rather than a shipment in commerce. Upon appeal of the Administrator, the Circuit Court of Appeals reversed the District Court upon the merits, stating:

"* * * the Post Office, in transporting the gold to the United States Mint in Pennsylvania [Philadelphia], was not the agent of the Mint, and the gold did not become the property of the Government until it had arrived at the Mint in Pennsylvania [Philadelphia], was duly receipted for, inspected and paid for by United States Treasury check. We therefore feel that the business conducted by Haile constituted interstate commerce within the Act and was not a mere administrative act of the Government."

The Court did not expressly so state, but the clear inference is that had the fact been that the Government owned the gold at the time the shipment was made from South Carolina to Philadelphia, such shipment would have been held to be an administra-

tive act of the Government, and not one in interstate commerce.

A similar situation is presented in Ritch et al. v. Puget Sound Bridge & Dredging Co., Inc., et al., 9 Cir., 156 F.2d 334, read in connection with Ritch et al. v. Puget Sound Bridge & Dredging Co., Inc., et al., D.C. W.D.Wash., 60 F.Supp. 670, and a like inference may be drawn.

As heretofore stated, the authorities are in conflict on the question as to whether or not the transportation across state lines by the United States to its military facilities of Government-owned munitions of war to be used in the prosecution of the war, is commerce, or, on the other hand, is an administrative act of the Government. Such transportation was held to be commerce and not an administrative act in Timberlake et al. v. Day & Zimmerman, Inc., D.C. S.D.Iowa, 49 F.Supp. 28; Umthun v. Day & Zimmerman, Inc., 235 Iowa 293, 16 N.W. 2d 258; and Bell et al. v. Seton Porter et al., 7 Cir., 159 F.2d 117.

In the Timberlake case, the District Court treated the question as one of first impression, and cited no definite authority to sustain its position. It referred to National Labor Relations Board v. Idaho-Maryland Mines Corporation, supra, and National Labor Relations Board v. Sunshine Mining Co., supra, but stated that neither of these cases had "squarely" decided that such shipments were not commercial transactions but administrative acts of Government, and it regarded as dictum the holding to this effect in National Labor Relations Board v. Idaho-Maryland Mines Corporation, supra.

In Umthun v. Day & Zimmerman, Inc., supra, the Supreme Court of Iowa cited Timberlake et al. v. Day & Zimmerman, Inc., supra, and also Clyde et al. v. Broderick et al., 10 Cir., 144 F.2d 348, 351, wherein the Court in the course of its opinion said: "There is nothing in the Fair Labor Standards Act which indicates an intent or purpose to exempt from its coverage employees whose activities relate to the movement in interstate commerce of personally owned goods of an employer or goods moving interstate for the convenience of the United States Government.

The Act creates no such exemptions and we cannot."

In the Clyde case, the plaintiffs were employees of Broderick and Gordon, contractors engaged in the construction of an ammunition plant at Salt Lake City, Utah, pursuant to a contract with the United States Government and the Remington Arms Company. During the construction period, equipment, tools and other supplies, either owned by the defendants or rented or purchased by them for use on the project, were transported on their order from points outside into the State of Utah, and after use on the plant were boxed, crated and shipped to points outside of the state. The lower court dismissed the action on the ground that the employees were not engaged in commerce or in the production of goods for commerce. The Circuit Court of Appeals reversed the case, and in doing so used the foregoing language cited by the Supreme Court of Iowa. The action in no sense involved a shipment by the Government in its sovereign capacity of Government property across state lines. There is quite a difference between such a shipment and a shipment made "for the convenience of the United States Government." All of the shipments in the mining cases heretofore cited by us were made "for the convenience of the United States Government."

The Iowa Court laid stress on the statutory definition of "commerce" found in Section 203(b) of the Fair Labor Standards Act, which has been hereinbefore set out, and pointed to the fact that it included "*transportation* * * * from any State to any place outside thereof," and reached the conclusion that this language included the shipment by the Government across state lines of Government-owned bombs. There is nothing particularly new in this definition of commerce. The National Labor Relations Act, upon which the suits in National Labor Relations Board v. Idaho-Maryland Mining Corporation, supra, and National Labor Relations Board v. Sunshine Mining Co., supra, were based, defines commerce as follows: "The term 'commerce' means 'trade, * * * commerce, *transportation,* * * * among the several States, or between * * * any foreign country and any State * * *";

29 U.S.C.A. § 152, and the word *"transportation"* has been repeatedly used in definitions of commerce laid down by the Supreme Court of the United States without in any sense conveying the impression that it meant transportation by the United States of its own property across state lines. For example: in Carter v. Carter Coal Co. et al., 298 U.S. 238, 298, 56 S.Ct. 855, 867, 80 L.Ed. 1160, "As used in the Constitution, the word 'commerce' * * * includes *transportation*, * * * of commodities between the citizens of the different states."; and in Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 241, 20 S.Ct. 96, 107, 44 L.Ed. 136, "As has frequently been said, interstate commerce consists of intercourse and traffic between the citizens or inhabitants of different states, and includes * * * the *transportation* of persons and property * * *."[3]

The Iowa Supreme Court also cited Walling v. Patton-Tully Transportation Co., 6 Cir., 134 F.2d 945. In this case the defendant, a cost-plus-a-fixed-fee Government contractor, was engaged in dike and revetment construction on the Missouri and Mississippi Rivers, and the Court held that inasmuch as this work was done on an instrumentality of commerce, the defendant and its employees were engaged in commerce. The case in our opinion is not in point with the issue under discussion.

In Bell et al. v. Seton Porter et al., supra, the Seventh Circuit Court of Appeals had under consideration an appeal from a District Court which had held that the eight hours sleeping time of firemen employed by the defendant (a cost-plus-a-fixed-fee Government contractor engaged in manufacturing munitions of war in the operation of the Elwood Ordnance Plant at Elwood, Illinois) was compensable working time under the Fair Labor Standards Act. The Court reversed the decision of the District Judge, with instructions to dismiss the complaint, on the ground that the sleeping time in question was not compensable as a matter of law. The Court went further and concluded that the plaintiffs were engaged in the production of goods for commerce,

inasmuch as the Government-owned munitions upon which they were working were thereafter transported by the Government across state lines, citing Umthun v. Day & Zimmerman, Inc., supra, and Timberlake et al. v. Day & Zimmerman, Inc., supra, and Clyde et al. v. Broderick et al., supra, all of which decisions have been discussed herein. No reference was made to the decision of the Supreme Court of Arkansas in H. B. Deal & Co., Inc. v. Leonard et al., supra, or to any of the gold and silver mining cases hereinbefore discussed, or to any of the District Court opinions, to which we have referred as authority for our holding. The Court referred to the statutory definition of "commerce," and in construing that term so as to cover the shipment involved, cited Atlantic Co. v. Walling, 5 Cir., 131 F.2d 518, wherein the Fifth Circuit Court of Appeals held that where the definition of "commerce" in the National Labor Relations Act included the restatement of that word along with the statement of other indices of commercial intercourse, Congress intended to enlarge the meaning of the word to include such transactions as *had theretofore been known and acknowledged as constituting commerce* in the constitutional sense. (Italics supplied.) There have been no cases cited to us, and we have found none, which were decided by any court prior to the enactment of the Fair Labor Standards Act, and which tended in any sense to hold that a shipment by the United States in its sovereign capacity of its own property across state lines, constitutes commerce.

With due respect to the courts holding to the contrary, we cannot agree that the shipment involved here is anything other than an administrative act of the Government.

Since the defendant, Ford, Bacon & Davis, Inc., in processing and assembling munitions of war for the Government at the Arkansas Ordnance Plant, was not engaged in the production of goods for commerce within the meaning of the Fair Labor Standards Act, it follows that the plaintiff working under it was not so engaged,

---

[3] Emphasis on the word "transportation" wherever used in this paragraph has been supplied.

and is therefore not within the coverage of the Act, and that his complaint should be dismissed.