## LASATER et al. v. HERCULES POWDER CO.

### Civ. No. 730.

District Court, E. D. Tennessee, S. D.
July 25, 1947.

Supplemental Opinion July 29, 1947.

---

Harry J. Schaeffer, E. B. Baker, and J. N. Hunter, all of Chattanooga, Tenn., for plaintiffs.

Whitaker, Hall & Haynes, of Chattanooga, Tenn., for defendants.

DARR, District Judge.

This action is brought under Section 16 (b) of the Fair Labor Standards Act of

1938[1] particularly Section 7(a), for unpaid overtime compensation, liquidated damages and attorneys' fee.

During the period covering the time for which recovery is sought, the plaintiffs were employees of the defendant. The defendant operated the Volunteer Ordnance Works (herein called the Plant) near Chattanooga, Tennessee, under a cost-plus-fixed-fee contract with the United States Government (herein called the Government) for the manufacture of trinitrotoluene (herein called TNT).

All the real estate upon which the Plant was built, being 6207.2 acres, was owned by the Government and the Government had jurisdiction thereover. All the personal property on and used in said Plant was owned by the Government, including the TNT and the materials for the manufacture thereof.

All outgoing shipments were made by the Government on Government bills of lading. All goods arriving by incoming shipments became the property of the Government at the Plant site, except a minor portion to which title vested in the Government at the shipping point.

The whole operation was under the control of the Government. During the operating period Government officials were constantly present and actively supervised and inspected. Subject to the control reserved in the Government, the Plant was maintained and operated by the defendant as an independent contractor, including the right to hire and discharge all employees.

Much of the material for the manufacture of TNT came from out of state sources, and the finished product was shipped to foreign countries.

The defendant, under agreement with the Government and in cooperation therewith, constructed a chainlike fence around the entire Plant, which fence was seven feet high and topped by three strands of barbed wire. There were two entrances, or gates, whereby persons could enter the Plant area, one known as the South Gate and the other as the North Gate. Practically all the employees were required to enter the South Gate. At the gates were a number of time clocks. Each employee was required to have an identification badge.

The defendant had a system of intra-plant buses which operated upon the defendant's premises conveying the employees free of charge. Regular buses operated from the North and South Gates to the working places and return. Other buses were used to take care of the employees who were late and for other purposes. An employee could be as much as 10 minutes late without being charged with loss of time.

Each employee was required to be at an entrance a sufficient period before his work hours so that he might be identified, clock in and be transported to his working place in time for the commencement of his shift. The employees' working places were various distances from the gates, the furthest point being about a mile and a half. In addition to the eight hours of the shift, the time spent by employees from arrival at the gate for work until the exit from gate at the end of the shift averaged approximately 40 minutes. It is for this claim of overtime that the plaintiffs bring suit.

The record made by the time clocks was not used to calculate the hours worked, but was used to check the presence of the employees. This check was used to authenticate the payrolls and was also a contribution toward arrangements for uninterrupted operations.

Some of the employees were required to change clothes and perhaps make other preparations for work. For the time thus spent there are incidental claims which will be hereinafter considered.

The defendant disclaims liability because (1) the rate of pay and working conditions of the plaintiffs were regulated by the Walsh-Healey Act, the Eight Hour Law, and the Davis-Bacon Act, and not by the Fair Labor Standards Act of 1938; (2) the plaintiffs were not engaged in commerce nor in the production of goods for commerce; (3) the time plaintiffs spent at the gates and in traveling on defendant's prem-

---

[1] Chapter 676, 52 Stat. 1060, 29 U.S.C.A. §§ 201–219.

ises to and from their places of work was not working time within the provisions of the Fair Labor Standards Act of 1938; and (4) under mandate of the Portal-to-Portal Act of 1947, being Public Law 49 of the 80th Congress, 29 U.S.C.A. § 251 et seq. the defendant under no circumstances is subject to any liability and the Court has no further jurisdiction of the action.

■ 1. From an examination of the Eight Hour Law,[2] the Davis-Bacon Act,[3] and the Walsh-Healey Act,[4] together with the Congressional history of labor laws raising standards of pay and working conditions, the conclusion is quite evident that the intended coverage of the Fair Labor Standards Act is not restricted because of these previous enactments. I deem it unnecessary to undertake to analyze the premises resulting in this conclusion.

■ The Fair Labor Standards Act is applicable to work under government contracts. Walling v. Patton-Tulley Transp. Co., 6 Cir., 134 F.2d 945.

2. (a) By oral presentation and the briefs, there has been extended argument on whether the plaintiffs were engaged in "the production of goods for commerce" in their employment for the defendant.

The materials for the production of the goods being owned by the United States, the finished product being munitions of war also owned by the United States, and the shipment across state lines and to foreign countries being by the United States for the prosecution of war, makes the question of whether the goods moved in interstate commerce quite perplexing. A number of courts have expressed divergent views.[5]

The settlement of this question is not determinative of the case, but I venture to offer an opinion.

■ The defendant offers no defense based upon an insistence that the plaintiffs were actually employees of the United States. The employment contract was between a private employer and the employees. Anyway, cost-plus-fixed-fee contractors with the Government engaged in war production are not agents of the Government and do not share the Government's sovereign immunities.[6]

If it should be that employees who work in private industry producing goods for the Government are not within the provisions of the Fair Labor Standards Act, then the purpose of the Act is defeated.

At Section 2 of the Act, 29 U.S.C.A. § 202, Congress announces findings showing the purposes which prompted it to enact the law. Among which purposes are the maintenance of the minimum standard of living necessary for health, efficiency and general well being of workers, and to prevent unfair method of competition in commerce.

If it be that persons working in private employment in producing goods that move across state lines are denied the benefits of the Act because the goods belong to the United States, there would result a probable curtailing of the earning power of such employees as compared with employees producing privately owned goods for commerce.

[2] Act of August 1, 1892, c. 352, sec. 1, 27 Stat. 340 as amended, directly and indirectly, all codified at 40 U.S.C.A. §§ 321–325.

[3] Act of March 3, 1931, c. 411, sec. 1, 46 Stat. 1494 as amended on August 30, 1935 and June 15, 1940, 40 U.S.C.A. § 276a.

[4] Act of June 30, 1936, c. 881, 49 Stat. 2036 as amended, 41 U.S.C.A. secs. 35–45.

[5] The parties cite cases that I do not consider in point even though there is some similarity. Sufficient to cite a few cases which seem to involve conditions like those in the case at bar: Unthum v. Day & Zimmerman, 235 Iowa 293, 16 N.W.2d 258; Timberlake v. Day & Zimmerman, D.C., 49 F.Supp. 28; Clyde v. Broderick, 10 Cir., 144 F.2d 348; Bell v. Porter, 7 Cir., 159 F.2d 117; Barksdale v. Ford, Bacon & Davis, Inc., D.C., 70 F.Supp. 690; Anderson v. Federal Cartridge Corp., D.C.Minn., 72 F.Supp. 644.

[6] Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43; Curry v. United States, 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9; Penn Dairies v. Pennsylvania Milk Control Comm., 318 U.S. 261, 262, 63 S.Ct. 617, 87 L.Ed. 748.

■ The Act is remedial and must be liberally construed. The fact that the employer is working under contract with the Government whereby other legislation might be applicable concerning wages and hours of the employees does not deprive such employees from claiming the benefits of the Fair Labor Standards Act. Therefore, determining whether or not the plaintiffs were engaged in "the production of goods for commerce" must rest upon a construction of the Fair Labor Standards Act.

■ I think that a person privately employed is entitled to the benefits of the Act if he aids in the production of any commodity that is transported across state lines regardless of who owns the commodity or for what purpose it is to be used.

■ (b) The insistence has been made that the TNT, being munitions of war, was not "goods" under the terms of the Fair Labor Standards Act. However, the defendant appears to concede that the definition in the Act is sufficient to cover the TNT, but that this commodity was not "goods" as having been delivered into the actual physical possession of the ultimate consumer (Sec. 3(i) of the Act, 29 U.S.C.A. § 203(i).

The proof is that the TNT moved on Government bills of lading, but the defendant remained in possession of the TNT and did the shipping upon instructions from the Government. The cars were loaded and jointly inspected by the railroad, by the Government and by the defendant. This was done to meet the rules set out by the Interstate Commerce Commission.

So actually the goods did not get into the physical possession of the United States before shipment. In addition, this provision of the Act is most probably for the benefit of the ultimate consumer and cannot be invoked by the producer.[7]

I might say parenthetically that evidently all hands thought all during the time of the manufacturing of TNT that this commodity was "goods" moving in commerce for they were scrupulous to observe the rules of the Interstate Commerce Commission.

■ Without an attempt to further and fully analyze this question, I give my opinion to be that the plaintiffs were engaged in "the production of goods for commerce" within the Fair Labor Standards Act.

3. The question now presented is whether the time spent at the gates and in being transported to the working places and return, or any portion thereof, was working time within the scope of Section 7(a) of the Fair Labor Standards Act.

The Supreme Court in similar situations has, in three cases, given a general formula for determining whether time so spent is a part of a statutory workweek. Tennessee Coal Co. v. Nuscoda Local, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949; Jewell Ridge Corp. v. Local No. 6167, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534; Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 1194, 90 L.Ed. 1515.

■ No time was spent in waiting to punch the time clocks in the case of Anderson v. Mt. Clemens Pottery Co., supra, but the claim was for the time spent in going to and from a gate to the working places. The formula therein announced is: " * * * It follows that the time spent in walking to work on the employer's premises, after the time clocks were punched, involved 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.' Tennessee Coal Co. v. Muscoda Local, 321 U.S. 590, 598, 64 S.Ct. 698, 703, 88 L.Ed. 949, 152 A.L.R. 1014; Jewell Ridge Corp. v. Local No. 6167, U. M.W.A., 325 U.S. 161, 164-166, 897, 65 S. Ct. 1063, 1065, 1066, 1550, 89 L.Ed. 1534, 2007. Work of that character must be included in the statutory workweek and compensated accordingly, regardless of contrary custom or contract."

■ While the premises over which the plaintiffs were transported were really those of the Government, yet I am of the

---

[7] See Interpretative Bulletin No. 5, U. S. Department of Labor, Wage and Hour Division, October 1940, par. 6, 1940 Wage-Hour Manual 133.

opinion that for all operational purposes, the Plant was the premises of the defendant.

It should be noted that the authorities above cited do not provide that time spent upon the employer's premises by an employee in going to and from work should be a portion of the statutory workweek. As further said in the case of Anderson **v.** Mt. Clemens Pottery Co., supra, " * * * the statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises, *on duty or at a prescribed work place* * * *." (Emphasis added.)

The time claimed by the plaintiffs falls within the formula above quoted, provided the circumstances show that the time claimed was required by the defendant and pursued necessarily and primarily for its benefit and the benefit of its business.

At the time the contract was made between the defendant and the Government there was war in Europe. The world situation created a national emergency in this country. Preparations were under way for the national defense. Proper governmental agencies were making surveys to the end that sabotage and espionage be prevented in those industries producing war materials for the Government.

A part of the program was to cause the erection of protective barriers around the operating area of such industries. This type of protective barrier was placed around the Plant involved in this case, the same being constructed under Government plan and supervision.

Strong lights were placed along the barrier for use at night, including the use of large spotlights. The underbrush was removed from outside the fence for some distance. In addition to stationary guards at entrances and other points and, a portion of the time, guards in sentry towers, the fence was patrolled 24 hours a day along patrol roads inside the fence. The guards, employees of the defendant, were also auxilliary military police. The guards on duty at the entrance gates were to identify employees as they entered the Plant as well as to ascertain the authority for other persons who might want to enter. They, as well as all other guards, were under strict orders to keep unwarranted persons from entering the premises.

The whole arrangements set up an effective manner to prevent sabotage and to keep out vagrants and others who might seriously damage property, all to insure uninterrupted production.

The manufacturing of TNT in quantities is limited to war times. There are no comparable plants in operation during peace time. It is true that industries manufacturing explosives, as well as other industries, have fences around their operation areas during peace time as a safety measure, but the mere fact that a fence is around a plant would not within itself cause the spending of time by an employee that could be considered a part of a statutory workweek. An employee might walk through a gate to his working place just in the same manner as if the fence had not been there and the premises had not belonged to the employer. Such a condition could not be said to be the spending of time for the primary benefit of the employer. Therefore, the situation in this case will have to be considered under the circumstances as they were.

This country was engaged in a desperate war of self defense. Any effort made directly in aid of the prosecution of the war was of primary importance to the Government. Certainly the manufacturing of TNT was a highly necessary and extremely important contribution to the war effort. The TNT from the Plant was shipped direct to the combat zone. Any interruption in the production of TNT at the Plant would have impeded the winning of the war. Therefore, the protection of the property in the Plant and the providing for continual operations by preventing interferences from outside sources was required by the Government and was necessarily and primarily for the benefit of the Government in the prosecution of the war. The only benefit to the defendant by preventing fires and explosions was to continue its right to acquire the "fixed-fee" without interruption, because injury to property or damages from injury or death of employees fell upon the Government under the con-

tract. The prevention of fires and explosions was a protection of life and limb to the plaintiffs.

The adjudication of any case wherein an Act of Congress is sought to be interpreted must be done with an idea of the Congressional intention as applied to the facts. There must be taken into consideration the fact that this was war time and the Government gave all advantages to the defendant because of the emergency. The contract so recites. Because of the abnormal conditions the Government agreed to pay all expenses and damages for which the defendant might have been liable, including damages for personal injuries, deaths, etc., except such as may have been caused directly by bad faith or willful misconduct.

This Plant was built, designed and operated solely for the purpose of manufacturing munitions of war. Being such plant it was protected by a barrier so as to insure continuity of operations. Any time that the plaintiffs may have spent by reason of the arrangements of the barrier, including time for identification and punching a clock, was required for the public good and was necessarily and primarily for the benefit of the public as a whole in the effort to win the war. Had unwarranted persons gotten on the Plant premises and caused explosions and fires, the furnishing of TNT for combat from the Plant would have ceased. It is not strained to say that the result might have been the loss of lives of American fighting men and the prolonging of the war even though it might have been for a very short period.

Many rights of citizens that could not be curtailed in peace time were taken away or restricted in war time. For example, when war threatened and came the best of the youth of our country were by legislative compulsion placed in mortal combat to stop the aggressor and win victory. By legal compulsion the lives and habits of all the citizens were regulated by the fixing of prices on life's necessities. By compulsion of law war scarce materials were apportioned among the citizens. Others, moved by patriotic fervor, gave of their time and their talents in sundry activities such as the Red Cross, Selective Service Boards, Ration Boards, Bond Sales, etc.

The spending of extra time placed no undue burden upon the plaintiffs. It was a part of their contribution to the war effort and is not compensable as unpaid overtime.

In times of war the modus operandi of all governmental, private and individual activities must be geared to win the war. Things are not as they usually and customarily are and cannot be so judged. The matter at hand comes under this category and has been so considered and determined.

I am of the opinion that the time claimed by the plaintiffs was not a part of a statutory workweek.

4. Heretofore I have not considered such time as might have been spent in the changing of clothing and other preliminary preparations for work.

An examination of the record convinces me that the time spent in these preparations was, in general, offset by the time allowed by the defendant to plaintiffs when not actually at work. For example, most of the employees were permitted to eat at odd times and the time not charged against them. A few had 30 minutes each for eating which was charged. Time was not charged against employees who were 10 minutes or less late. Also, short periods for relaxation were not charged.

As to any time spent in the preparations not offset in the manner set out, I am of the opinion that the de minimis maxim applies. Anderson v. Mt. Clemens Pottery Co., supra; Anderson v. Mt. Clemens Pottery Co., D.C., 69 F.Supp. 710, appeal to 6 Cir., 162 F.2d 200.

5. Only recently proper pleadings have been filed to make the issue as to whether prosecution of plaintiffs' case is barred by the Portal-to-Portal Act of 1947, being Public Law 49 of the 80th Congress.

In Section 1(a) of the Act of the Congress set out in detail the reasons for enacting this Law. A reading of these findings clearly brings this case within the purview of the type case intended to be affected by the Act.

As affects the question for consideration, Section 2 of the Act provides for relief from certain existing claims under the Fair Labor Standards Act.

In view of the fact that the plaintiffs concede the constitutionality of this section of the Act and that it is applicable to the case at bar, these questions need not be considered.

■ The plaintiffs make the point that their claims are an exception to the provisions of this part of the Act by reason of the existence of an express provision of a contract in effect at the time of employment.

As this suit is based upon the Fair Labor Standards Act and not upon contract, and the proof without contradiction discloses no express contract between the plaintiffs and the defendant for payment of the time claimed, there can be no contention that there was a contract for such payment independent of the Fair Labor Standards Act.

■ Plaintiffs' claim is that the Wage and Hour provisions of the Fair Labor Standards Act became a part of the contract of employment in each case after said Act became the law. That even though there might be a contract between employer and employees inconsistent with the terms of the Fair Labor Standards Act, the terms of the Act itself would prevail as the employment contract. Hence the plaintiffs contend that Section 2 of the Portal-to-Portal Act of 1947 does not apply to them.

If the plaintiffs' contention be true, Section 2 of this Portal-to-Portal Act of 1947 is entirely without avail. No employer would be benefited and the prime intention of the Act would be defeated.

Had their been a contract for payment of the time claimed independent of the law, it would have been within the power of the Congress to enact the provisions of Section 2 of the Portal-to-Portal Act of 1947 leaving out the exceptions and thus barring claims. I understand that the plaintiffs' counsel concede this to be correct law.

Therefore, the question to be determined is not whether the Fair Labor Standards Act became a part of the contract between each employer and each employee who were under the terms of the Act, but rather what Congress intended in the Portal-to-Portal Act of 1947 by the word "contract" in said exception at Section 2(a) (1).

■ Reading contextually I think it is quite obvious that the Congress intended to make the exception applicable only to express written or non written contracts made between the employer and employees without regard to any legislation. Certainly the Congress did not intend to pass a nugatory law.

I am of the opinion that Section 2 of the Portal-to-Portal Act of 1947 relieves this defendant from any liability in this suit and takes away the jurisdiction of this Court to hear and award a judgment in this case.

■ 6. A part of the issue recently made is whether Section 9 of the Portal-to-Portal Act of 1947 is a bar to this action. This section provides that good faith action of an employer in conformity with his reliance on an administrative ruling or interpretation would be a good defense in a suit by an employee under the Fair Labor Standards Act.

I would say that the proof in this case would show that the defendant did act in good faith in conformity with and in reliance upon an administrative interpretaton announcing that such time claimed by the plaintiffs in this suit was not compensable.

The plaintiffs insist that this section of the Portal-to-Portal Act of 1947 is unconstitutional as delegating legislative power to administrative action. The case of Schechter v. United States, 295 U.S. 495, 55 S.Ct. 537, 79 L.Ed. 1570, 97 A.L.R. 947, is stressed as being clear authority for the plaintiffs' position.

There is a difference in that case and the one at bar. In the Schechter case the determination of the Court was upon prospective action through legislative permission, while in the case at bar Section 9 is an approval of retrospective action and conduct.

■ For consideration is the well known line of cases announcing that a right granted by Congress may be with-

drawn by Congress if unexercised. This Section 9 does not declare any administrative regulation or interpretation to be a correct announcement of the law, but does provide that when such regulation or interpretation, whether correct or not, has been accepted in good faith by an employer and he has acted in reliance thereon, such is a good defense in an employee's action under the Fair Labor Standards Act. I see no reason why the Congress could not have provided for the concurrence of these two acts as being a defense to suits under the Fair Labor Standards Act in the original passing thereof. The Congress had the same authority to take away or modify a right given in the original Act where such right had not been exercised. Section 9 of the Portal-to-Portal Act of 1947 conforms to this principle.

I think it is clear that Section 9 is a constitutional enactment.

A portion of the announcements made in this opinion were prepared some months ago but not filed. I was of the opinion that time and expense would be saved to the litigants by awaiting clarification of the situation by judicial opinion or action of the Congress. I think developments have verified the correctness of this position.

All possible questions, so far as I can see, have been presented and I have undertaken to pass on each of them.

For reasons heretofore stated the defendant is awarded a judgment.

### Supplemental Opinion.

In the original opinion I overlooked announcing that after the recent amendments the cause was to proceed to judgment upon the proof already before the Court.

My attention has been called to the fact that the amendment to the complaint claims compensable working time by reason of custom. This, of course, is offered as coming within the exceptions provided in Section 2 of the Portal-to-Portal Act of 1947.

Nowhere is there any proof that there was, or had been, a custom or practice to pay for time consumed in going to or from a working place. The custom and practice throughout the years has been that work-men are paid for the time actually consumed in production.

Therefore, the claim of exception by reason of custom is without merit.

This supplemental opinion will be filed and considered as a portion of the adjudication of this case.